CHARLES THOMPSON v. THE STATE.

No. 4068.   Decided May 10, 1916.

**1.—Murder—Evidence—Res Gestae—Dying Declarations.**

Upon trial of murder, the State was permitted to introduce the res gestae declarations and dying declarations of the deceased made a short time after the fatal injury, there was no reversible error, and the question as to whether the deceased was conscious at the time would not render the testimony inadmissible, but would only go to its weight.

**2.—Same—Evidence—Impeaching Witness.**

Upon trial of murder, where defendant introduced a witness who testified that in her opinion the declarations of deceased were made when she was un-conscious, there was no error to impeach her testimony by showing that she had made different statements prior thereto.

**3.—Same—Evidence—Motive.**

Upon trial of murder, there was no error in admitting testimony of a pre-vious quarrel between deceased and the defendant and what defendant said, to show motive for the crime.

**4.—Same—Continuance—Imputing Crime to Another.**

Upon trial of murder, there was no error in overruling defendant's applica-tion for a continuance, as it appeared from its face that the parties who were imputed to have committed the crime had no opportunity to commit the offense.

**5.—Same—Circumstantial Evidence—Charge of Court.**

Where, upon trial of murder, the case depended upon direct and positive testimony for a conviction, there was no error in the court's failure to charge on circumstantial evidence.

**6.—Same—Res Gestae—Declarations of Deceased.**

Where, upon trial of murder, the statements made by the deceased were made a short time after the homicide, when her suffering excluded the idea of fabrication, there was no error in admitting the same as res gestae. Following Boothe v. State, 4 Texas Crim. App., 208, and other cases.

**7.—Same—Evidence—Res Gestae—Dying Declarations—Questions and An-swers.**

Where, upon trial of murder, the court admitted testimony as to declarations of the deceased who was then in a dying condition and who stated that the de-

fendant assaulted her, and this occurred shortly thereafter, there was no reversible error, although the statements were made in answer to questions which were not calculated to lead the deceased to make any particular statement. Following Hunter v. State, 59 Texas Crim. Rep., 439, and other cases.

**8.—Same—Evidence—Conduct and Declarations of the Deceased.**

Upon trial of murder, there was no error in permitting the witness to testify that the deceased was conscious when he shaved her head, describing her conduct, and which was introductory to her dying declaration that defendant hit her with a hammer.

**9.—Same—Evidence—Predicate—Impeachment—Bill of Exceptions.**

Where appellant contended that there was no predicate laid to impeach one of his witnesses, but the bill of exceptions did not show that any such objection was urged in the trial court, it comes too late.

**10.—Same—Evidence—Qualifying Bill of Exceptions—Threats.**

Where defendant permitted his bill of exceptions to be qualified, with reference to the admission of testimony as to defendant's threats against the deceased, there was no reversible error. Following Blain v. State, 34 Texas Crim. Rep., 448.

**11.—Same—Opinion of Witness.**

Where the witness, in language could not portray what she saw and observed, there was no error to permit her to express an opinion that from the conduct of the deceased at the time she was conscious when she declared that the defendant assaulted her.

**12.—Same—Sufficiency of the Evidence—Death Penalty.**

Where, upon trial of murder, the evidence was sufficient to sustain the death penalty by showing a wanton and cruel murder, there was no reversible error.

Appeal from the District Court of Wichita. Tried below before the Hon. Wm. N. Bonner.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Ralph P. Mathis* and *Wayne Somerville,* for appellant.—On question of dying declarations: Lyles v. State, 86 S. W. Rep., 763; Craven v. State, 90 S. W. Rep., 311.

On question of res gestae: Lockhart v. State, 111 S. W. Rep., 1024; Ward v. State, 159 S. W. Rep., 272; Porterfield v. State, 141 S. W. Rep., 968.

*C. C. McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was convicted of the murder of Pearl Bransford, and his punishment assessed at death.

Dr. MacKechney testified to being called to see the woman; that he had her carried to the sanitarium, and that the wounds she received were the cause of her death. He testified her face was literally torn all to pieces—that her upper jaw was broken, and all her teeth on the right side were broken loose; her lower jaw was broken, and there were seven distinct wounds on her head; that he found a hammer there bloody; that there were wounds practically all over her entire scalp,

and there were several places where the outer table of her skull was broken. He says he told Mr. Nelson and his wife that he thought it was useless to attempt to do anything for her, but at their request he treated her. That in his opinion the woman was conscious; and he furthermore testified that he informed the woman she was going to die and that she wanted to tell the truth. Mrs. Nelson says the woman was informed that she was going to die, and the doctor thought she was dying.

The doctor's testimony and Mrs. Nelson's testimony would be admissible both under the res gestae rule and as dying declarations. While the statements made to the undertaker were some time after the statements were made to the doctor, yet his testimony would tend strongly to show that she was conscious, and his testimony would be admissible as a dying declaration.

There are a number of bills objecting to testimony wherein when asked who did it, she would answer to "Sharles"; to others Charles Thompson, and to others would nod her head in the affirmative when asked the question. It is true that witnesses for appellant testified they did not think she was conscious, but this would not render the testimony inadmissible, but go to the weight to be given it by the jury. When the State's witnesses testified that she was conscious and informed that she was going to die, this made a prima facie case, and rendered the testimony admissible. When the defendant offered testimony that she was not conscious of what she was saying, this rendered it a question of fact to be determined by the jury. None of the bills complaining of the admissibility of this testimony present error.

The testimony of Dr. MacKechney as to what Miss Gossler said to him was admissible. Appellant introduced Miss Gossler and had her testify that in her opinion the woman was unconscious when she made the statements that appellant inflicted the injuries on her head. Any statement she had made to Dr. MacKechney prior to her so testifying would be admissible as tending to impeach her, and the court in approving the bill says he so limited the testimony.

The testimony of a previous quarrel between deceased and appellant was admissible as tending to show motive for the crime. The witnesses testify that appellant had told the negro woman that "no other man should have her." It was shown another man called on her that evening and was to call again that night, and when he did call he found the negro woman murdered. It is shown that appellant could have and probably did know that Ben Henderson had called that evening and was to call again that night.

The court did not err in overruling the application for a continuance. While it is always permissible to show that another probably committed the crime, or that another had made threats, or had ill-will, if the testimony goes further and would place such person in such proximity to the person that he might or could have committed the deed. The fact one absent witness would testify that he "knew the woman was quarrelsome, and knew of two men who had made threats"

would be immaterial, unless such other two persons, or one of them, were placed in such position where they had an opportunity to commit the offense. There is no allegation in the motion as to where the two persons were on the night of the homicide, nor is the name of either of them given. The fact that the absent witnesses had never heard appellant make any threats toward deceased, would be immaterial, nor would such testimony tend to weaken the testimony of the State's witnesses who heard and testified to the threats. Doubtless any number of men could have been picked up who would have testified and testified truthfully they had never heard appellant make a threat. Before the testimony of such witnesses would become material they would have to place themselves in position to have heard the threats testified to by the witnesses for the State. There is no allegation they were present on such occasion, nor is it so contended in the record before us.

Three or four witnesses testify to the fact that deceased, in her dying declaration, said appellant committed the offense and the court did not err in refusing to charge on circumstantial evidence. It was a case depending on direct and positive testimony. If the jury had not believed the woman was conscious when she made the statements charging appellant with having inflicted the wounds which caused her death, they should not and would not have convicted him, much less assess the highest penalty known to the law.

The judgment is affirmed.

*Affirmed.*

### ON REHEARING.

### June 14, 1916.

HARPER, JUDGE.—Appellant has filed a motion for rehearing, and as the death penalty was assessed we have again gone over the entire record, and will again take up each question presented by appellant in his motion.

He first contends we erred in holding the testimony of Dr. MacKechney admissible as res gestae. The testimony shows the doctor was called as soon as the woman was discovered, and this is shown by the record to have been very soon after the blows were inflicted. The doctor testified that "from my examination of her, and observation of her, and talking with her, I believe she was thoroughly conscious. I convinced myself of that fact, and asked her if Sam hit her, and she gave me to understand that he did not. She did not distinctly say 'No,' because in her condition she could not speak plainly, but she said as I understood it, 'No,' and shook her head. I then asked her if Charlie did this, and she indicated 'Yes,' nodded her head." He says that this was about fifteen minutes after he got to the house, and that the woman was suffering intense pain, and he gave her a dose of morphine. That he did not give her enough morphine to render her unconscious. He testified: "All of the upper right side of her jaw was badly frac-

tured, and her lip and cheek lacerated, and the teeth on the right hand side were loosened clear back." He describes her other wounds also, but we have named these to show why she could not speak plainly. In Branch's Penal Code, page 52, the rule is laid down that "statements made by the deceased a short time after the homicide as to how it occurred are admissible as res gestae where suffering excludes idea of fabrication," citing a number of authorities beginning with Boothe v. State, 4 Texas Crim. App., 202; Lewis v. State, 29 Texas Crim. App., 201; Lewis v. State, 43 Texas Crim. Rep., 338.

Appellant also insists that the testimony of Mrs. Walter Nelson was inadmissible. This lady testifies to going right to the woman and getting there before Dr. MacKechney did, and she says that the doctor told the woman: "Now, Pearl, you are going to die. You probably will die. I think you are dying, and you try to tell who killed you," and the woman replied, "Sharles." That when this statement was made to her by the doctor, the woman raised herself up on her elbow and said, "Sharles." This would be admissible both as dying declaration and as res gestae. Appellant says it was in answer to a question. That is true, but the statement or question was not such as to suggest the answer to be made. It left her free to name the person who had struck her, without any suggestion as to whom she should name. It has always been the rule that it is no objection to a dying declaration that it was made in answer to questions, if the questions were not calculated to lead the deceased to make any particular statement. Hunnicutt v. State, 18 Texas Crim. App., 498; Pierson v. State, 18 Texas Crim. App., 524; White v. State, 30 Texas Crim. App., 652; Grubb v. State, 43 Texas Crim. Rep., 72; Hunter v. State, 59 Texas Crim. Rep., 439.

Appellant next insists that the testimony of E. G. Hill was inadmissible wherein the witness testified that he was preparing to shave her hair off and cleaning her head for that purpose, that he knew she was conscious, for when he told her to put her hand in a pan of water she did so, and while shaving her head he would tell her to turn her head and she would do so. He says this was not in regard to nor descriptive of the manner of the death. But this testimony was admissible on the issue of consciousness and was but introductory to permitting the witness to testify that the woman told him that Charlie did it, and that he hit her with a hammer. Under the testimony of Mrs. Nelson above as to what the doctor told the woman about her going to die, we think the testimony admissible.

Appellant now contends that there was no predicate laid to impeach Miss Gossler, and, therefore, Dr. MacKechney should not have been permitted to testify to the impeaching statement without a predicate being laid. It is sufficient to say that the bill does not show that any such objection was urged in the trial court, and it can not be presented now for the first time on motion for rehearing in this court. It comes too late.

Previous quarrels are always admissible to show motive. Appellant

insists we were in error in quoting the substance of the threat testified to by Mike Osborn. The exact language is, after the woman had refused to let appellant stay with her: "If you can't stay with me, you will never live for nobody else." This was peculiarly admissible in the light of the facts that another negro was to go to the house the night she was killed, and she was killed before he got there. Appellant was also placed in position that he could have known that the other negro was going to deceased's home. As to appellant's objection to the court's qualification of one of his bills, he should have done this before filing the bill as qualified. Blain v. State, 34 Texas Crim. Rep., 448.

After Mrs. Dolman had testified to seeing the woman moaning and swaying her body, raising her body on her elbows, and screaming when the doctor examined her wounds, and heard what the witnesses said to her, and her answers, there was no error in permitting her to state that in her opinion the witness was conscious. This is one of the instances in which the witness in language can not portray what she sees and observes and is permitted to express an opinion.

The only other objection is, that the testimony is insufficient to sustain the death penalty. If the evidence will not sustain the death penalty it is wholly because appellant is not sufficiently identified as the person who committed the crime, and if that is true, no penalty should be sustained. The mode and manner of killing this woman was most cruel and wanton. The doctor testified: "When I arrived, in the servant house I found a negro woman lying on the floor, with her face literally beat all to pieces,—I have practiced medicine for twenty years, and I have never seen anything like it. This upper jaw was broken and all of her teeth on this side, right side, were knocked loose. Her lower jaw was broken and she was beat over the head. I think there was seven distinct marks on her head. It looked like this had been done with a hammer, and in fact I found a hammer lying there on the floor, bloody, that compared with it; that is, the bit of a hammer compared with the size of the wounds on her head."

Appellant's counsel made an able defense and undertook to fasten the crime on another and prove an alibi for appellant. The jury solved these questions against him, and we can not say they were not authorized to do so.

The motion for rehearing is overruled

*Overruled.*