## Silas Thompson v. The State.

### No. 3613. Decided June 23, 1915.

Motion for rehearing withdrawn, request of appellant, October 4, 1915.

**1.—Assault to Murder—Evidence—Conspiracy—Declarations and Acts of Co-conspirators.**

Where, upon trial of assault to murder, the testimony taken as a whole showed that the defendant and his wife were acting together in the commission of the alleged offense, there was no error in admitting in evidence the declarations and acts of the latter before and during the alleged offense, although the wife of the defendant may not have known at the time that the latter was going to shoot from ambush, and although she may not have been responsible for that act; there being no objection to the court's charge, or special charge requested to submit this issue. Davidson, Judge, dissenting.

**2.—Same—Rule Stated—Acts and Declarations of Co-conspirators.**

In any case where such acts and declarations are introduced in evidence, and the whole of the evidence introduced on the trial, taken together, shows that a conspiracy actually existed, it will be immaterial whether the conspiracy was established before or after the introduction of such acts or declarations. Following Smith v. State, 21 Texas Crim. App., 107.

**3.—Same—Evidence—Husband and Wife—Res Gestae.** ·

The acts and declarations of the wife are admissible against the husband when they are res gestae of the transaction, if she is an aider or abettor of her husband in the commission of the offense. Following Cook v. State, 22 Texas Crim. App., 511. Davidson, Judge, dissenting.

**4.—Same—Evidence—Contradicting Witness—Imputing Crime to Another.**

Upon trial of assault to murder, there was no error in not permitting defendant to ask a State's witness, after he had answered in the affirmative that he had been indicted for murder some twenty-two years ago, whether he had not been shot at from ambush before this time, as this was too remote.

**5.—Same—Argument of Counsel—Suspended Sentence.**

While it was highly improper for the district attorney to say that the filing of a plea by the defendant for suspended sentence was equivalent to a plea of guilty, the same was not reversible error in the absence of a requested instruction to withdraw the same from the jury.

Appeal from the District Court of Coryell. Tried below before the Hon. J. H. Arnold.

Appeal from a conviction of assault with intent to murder; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Moore & Short,* for appellant.—On question of acts and declarations of wife of the defendant. Ray v. State, 64 S. W. Rep., 1057; Seymour v. State, 71 Texas Crim. Rep., 76, 158 S. W. Rep., 304; Boyd v. State, 163 S. W. Rep., 70; Johnson v. State, 67 Texas Crim. Rep., 441, 148 S. W. Rep., 328.

On question of suspension of sentence and argument of State's counsel: Bradley v. State, 72 Texas Crim. Rep., 287, 162 S. W. Rep., 515; Onstott v. State, 75 Texas Crim. Rep., 72, 170 S. W. Rep., 301.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of imputing crime to another: Oates v. State, 67 Texas Crim. Rep., 488, 149 S. W. Rep., 1194.

On question of argument of counsel when same has not been excepted to: Penn v. State, 36 Texas Crim. Rep., 140; Garello v. State, 31 id., 56, and cases cited in the opinion.

HARPER, Judge.—Appellant was convicted or assault to murder, and his punishment assessed at two years confinement in the State penitentiary.

Charley Smith is the alleged assaulted party. The evidence shows Smith and appellant's farms joined. That the Branchville schoolhouse, located on a small plot of ground, was moved, when appellant and Smith

both claimed the ground on which the school had stood. Words ensued and a bad state of feeling was engendered. It is shown that in a telephone conversation appellant said to Smith, "G—d d—n you stay off that land." Smith replied, "I expect if you will come over there this evening you will find me plowing," when appellant responded, "If you do G—d d—n you I will make it hot for you." Appellant admits using this language, but says he intended to make it hot for him in law. Several days after this while Smith and Searcy Glass were plowing in this plot of ground, and Floyd Blanchard was cutting bushes, Mrs. Thompson (appellant's wife) on her way to The Flat saw them at work and went in at the gate, and asked them what they were doing, to which Smith replied they were breaking the land. Mrs. Thompson ordered them to get off of the land, Smith replying he was not going to get off. Mrs. Thompson then left, going in the direction of her home, saying as she did so, "You will go when I get back." Smith testifies that in about ten minutes after Mrs. Thompson left, he saw appellant on the railroad dump going in the direction of Grover Beck's. He is very positive that it was appellant he saw, saying, "The man I saw was Silas Thompson"; that he had on a pair of bright yellow pants. That pretty soon after he saw Thompson on the railroad dump, Mrs. Thompson returned and came from towards her home. He says she again demanded that he get off the ground, and testifies: "I do not know that I could repeat the old lady's language, but it was just a demand to get off the land. The old lady had her right hand under her apron against her body that way, and she spoke to me in such emphatic terms and I asked her if she had a pistol under her apron, and she said she did and I said, 'I suppose you aim to use it?' and she said she did, and I says, 'Give me time to unhitch my team from the plow,' and told her I did not want my team to run away and get cut up in the wire, and I told her if I was as low down as they thought I was it would not be against the law to kill me, and we talked on, and she asked me if I was willing to arbitrate it, and I told her I was and that I was not only willing to arbitrate it but if she would go out of the community where it would not involve our neighbors that I would let her choose the arbitrators, and she selected Juber Brown and Mr. Edwards and Bailey, and I told her I would abide by what they said, and I asked her would Silas abide by it, and she said she did not know, she thought he would, but he would be there in a few minutes, and said for me not to say anything that would fret him, and I told her it was a business proposition with me and that I would not say anything to aggravate him, and I asked her where he was, and she said he was over in the field, and said that she told him to come over here, that I was over here, and said that he started but she did not know where he went, and I said, 'He went down to Beck's to get his gun,' and she did not make any reply, and about that time the first shot was fired, and I turned to look in the direction of where the shot seemed to have come from right across the dump with the lay of the land. The ground I was on was nearly level with just a little

slope to the south. The mountain was south and southeast of where
I was, just across the railroad dump. The point of that mountain
was covered with bushes. It was sixty or seventy yards from where I
was standing to those bushes on the point of the mountain. Mrs.
Thompson was ten or twelve feet from me when the first shot was
fired, and when the first shot was fired she walked about that much
further, and says, 'You had better get out of here now, you are going
to get hurt and you are going to get hurt bad,' and I told her that I
would not go off in the condition I was in, that I might be carried off,
but I would not go in the condition I was in, and we began to talk
about the arbitration again, and then there was a second shot fired.
It was from three to five minutes from the time the first shot was fired
until the second one was fired. That second shot hit me. It hit me
in the right shoulder or arm, and my team got to cutting up and I
told the boys not to let them get in the wire, and the Blanchard boy
jumped and grabbed the team, and I told Glass to unhitch them from
the plow, and by that time I had my shirt unbuttoned and Glass asked
me if I was hurt much, and I told him I thought my shoulder was
broken, and when they got the teams unhitched they came to where
I was, and I told them that I thought it was only a flesh wound, and
Searcy asked me if we had better not cross the creek, and I told him
yes, that I had better go home, that I was losing a good deal of blood,
and we started and got across the creek north of where I was standing
and a third shot was fired. There was some brush on that creek but
not so very much at that point. Anyone shooting at me from the
point of the mountain could have seen me where I was when the third
shot was fired. After the third shot I went home and did not hear
anything more. I did not hear the bullet from the third shot."

Searcy Glass testifies in substance to the same state of facts, only
he was not able to identify the man on the railroad dump.

Floyd Blanchard also testifies to the same state of facts, adding that
when she left the first time he heard her say she was going to get
Silas. He says he did not recognize the man on the railroad dump,
but he had on a pair of bright yellow pants. He further testifies that
after the second shot was fired, he saw a man jump off the point of
the mountain into the cut. The man he saw jump into the cut had
on yellow pants. That this was the point from which the shots came,
and after the shooting he went up there with the sheriff and they found
a man's track and a woman's track going in the direction of the Thompson
home.

It can hardly be gainsaid that Mr. Thompson was the man these
people saw on the railroad dump, for in his testimony he admits that
after his wife left home, he decided to go to Grover Beck's and borrow
his 30-30 rifle to kill some rabbits that were destroying his potato
patch; that he traveled the road these State witnesses say, and also
admits that he had on yellow pants, and was on the railroad dump.

Grover Beck testifies that appellant came to his house and borrowed
his 30-30 rifle between 12 and 1 o'clock. Of course, if we take the

defendant's testimony and the testimony of his witnesses alone, the question of whether or not appellant and his wife were acting together would not be raised, for Mrs. Thompson says on this trial she did not see her husband from the time she left until after the shooting. Appellant also so testifies, and his daughter-in-law, Mrs. Myrtle Thompson's, testimony would strongly support that theory. But we must take the testimony as a whole, and if it raises the issue that they were acting together, then the acts and declarations of each are admissible during the time of the preparation for the act and while it is being consummated. In Phillips v. State, 6 Texas Crim. App., 368, the following quotation from Wharton on Evidence, section 1205, is quoted approvingly: "The least degree of concert or collusion between the parties to an illegal transaction makes the act of one the act of all." Judge White, in the well-considered case of Smith v. State, 21 Texas Crim. App., 107, discusses this question thoroughly, and holds that the old rule that a conspiracy must first be established ipso facto, before proof of acts and declarations of the individuals engaged therein are admissible against each other, is now exploded. In any case where such acts and declarations are introduced in evidence, and the whole of the evidence introduced on the trial, taken together, shows that a conspiracy actually exists, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts or declarations. And in that case it is correctly held that an acting together may be shown by circumstances, for it is rarely ever possible to obtain positive testimony of a conspiracy. And while a conspiracy can not be shown alone by the declarations of an alleged co-conspirator, yet such declarations may be taken into consideration in connection with other facts and circumstances in the case, and if the evidence as a whole justifies and supports a finding that the parties were acting together in the commission of the offense, the testimony is admissible.

Now, what facts and circumstances does the State offer in evidence to show that appellant and his wife were acting together in making the assault on Smith. It introduces in evidence a telephonic conversation between appellant and Smith, in which appellant said, "G—d d—n you I will make it hot for you." A few days subsequent to this while Smith is on the land, Mrs. Thompson appears on the scene and orders Smith off the land, and when he refuses to go, she turns and leaves, saying as she did so, "You will go when I get back. That she would go and tell Silas (appellant) and he would put Smith off." In about ten minutes after Mrs. Thompson leaves, appellant is seen on the railroad dump, going in the direction of Grover Beck's. He borrows a rifle at Grover Beck's, getting either three or five cartridges. Appellant admits he went to Grover Beck's and borrowed the 30-30 rifle, and that he had on bright yellow or khaki pants. About ten or fifteen minutes after appellant is seen on the railroad dump going in the direction of Beck's, Mrs. Thompson reappears on the ground and again orders Smith off the land. Some discussion arose in which an arbitration was discussed. When Smith asked Mrs. Thompson if Silas (appellant)

would agree to it, she said appellant would be there in a few minutes. Smith asked her where appellant was, and she responded, "He (appellant) was over in the field, and said that she told him to come over here; that he (Smith) was over here, and he started, but she did not know where he went." Smith replied that he had seen appellant, and Silas had gone over to Beck's to get his gun. Mrs. Thompson did not reply to this remark, for about this time a shot was fired from a clump of bushes at a point on the mountain some sixty or seventy-five yards away. When this shot was fired Mrs. Thompson said, "You had better get out of here now—you are going to get hurt and get hurt bad." A second shot was fired, which struck Smith in the shoulder. Smith and those with him turned to go home, and while they were going a third shot was fired, which went into a tent and struck an iron bedpost. Floyd Blanchard says just before the third shot was fired a man, wearing bright yellow pants, jumped down from this point on the mountain. When he saw Mrs. Thompson leave she went in the direction of the point where this man was seen. Later the ground was examined and a man's track and the track made by a woman's shoe were found, and near the clump of bushes from where the shots were fired a 30-30 empty shell was found. This shell fitted the gun appellant had borrowed from Beck that day, and when arrested at home that evening he was wearing yellow pants and had Beck's gun in his possession. These and some other circumstances are relied on by the State to show that appellant and his wife were acting together, and we think would authorize a jury to so find. It may be that she did not know that he was going to shoot from ambush, if he did do so, but it certainly would authorize them to conclude that when she saw Smith at work on the plat of ground in question, and he declined to leave when she ordered him to do so, she went in search of her husband and found him, for when she comes back she says she had found him, although she on the trial denies it. When she found him she explained to him Smith was plowing the land. She was aware that he went to Beck's after his 30-30 rifle, and she expected him to return with it and make Smith leave. She may not have understood that appellant would shoot from ambush, and she not be responsible for that act, but there was such an acting together in an effort to make Smith get off the land and in preparation to accomplish that object as to render her acts and conduct admissible on the issue of whether or not appellant was the person who fired the shot from the clump of bushes on the point of the mountain. Appellant seems to think this would be compelling the wife "to testify against the husband." Mrs. Thompson was not called as a witness by the State. Of course, Mrs. Thompson could not have been called to prove these facts, and if she had been appellant's objection would be sound and tenable. But the State proved these facts and circumstances by other witnesses, and the acts and declarations of the wife are admissible against the husband, which are res gestae of the transaction, if she is an aider and abettor of her husband in the commission of the offense. Judge White reviews the authorities and de-

cides this question in Cook v. State, 22 Texas Crim. App., 511. He
says:

"With regard to the declarations of the wife, made during the prog-
ress of the difficulty, just preceding and subsequent to the shooting of
Russell, they were admissible as verbal acts and were clearly parts of
the res gestae, and consequently did not come within the rule announced
in article 735, Code of Criminal Procedure, which prohibits a husband
and wife from testifying against each other in a criminal prosecution.

"Again, the evidence as developed in this case shows that the hus-
band and wife acted together in the commission of the offense, and are
both principals, and the rule is uniform that the declarations of one
of the parties principal made at the time, during the progress and in
furtherance·of the common design, are admissible in evidence and bind-
ing upon the other co-conspirators. (Cox v. State, 8 Texas Crim. App.,
254; Loggins v. State, id., 434.)"

It may be that the court should have instructed the jury that if they
did not find that Mrs. Thompson was acting with, aiding and abetting
her husband, they would not consider any testimony as to her acts or
declarations, in passing on the guilt or innocence of appellant. But
appellant made no such objection, nor requested any such instruction,
relying solely upon his objection that the testimony was inadmissible.
This objection can not be sustained, for the State introduced sufficient
evidence, circumstantial and otherwise, to render the testimony admis-
sible, and the court did not err in so holding.

On cross-examination of Charley Smith, appellant was permitted to
ask him if he was indicted for the murder of Ed Cash some twenty-
two years ago. He answered that he was, but that the case against
him was dismissed. Appellant then propounded to him the question,
if since the killing of Ed Cash he, prosecuting witness, had not been
shot at from ambush before this time. The State's objection that this
was too remote was sustained by the court. The court in approving
the bill states he had the witness state to him before ruling what his
answer would be, and his answer would have been: "that over twenty-
two years ago one Ed Cash was killed by mob violence in Coryell
County, Texas. C. G. Smith was charged with murder growing out
of that transaction, the case against him never being tried but having
been dismissed. I permitted the proof on cross-examination of the
witness Smith that he had been charged with murder in connection
with the killing of Ed Cash, although if the State had objected to it,
it probably would not have been admissible on account of its remoteness.
The defendant asked Smith if after the killing of Cash he, Smith, had·
not been shot at. The State objected to the question and answer, and
I sustained it. The witness Smith would have sworn that shortly after
Ed Cash was killed that one of his brothers, towit: Virgil Cash, did
shoot at him, Smith, but that this took place about twenty years ago.
If permitted to do so, Smith would have sworn to the facts as stated
in his qualification, i. e., that he was shot at by Ed Cash's brother
shortly after Cash was killed, but he would not have testified as to

any other shooting by any other parties at any other time." This was too remote in time, and the court did not err in so holding.

In another bill it is shown that in presenting the case the district attorney said: "That the plea of the defendant filed herein wherein the defendant asked for the suspended sentence in case they found him guilty and assessed his punishment not to exceed five years was a 'baby act' on the part of the defendant and that if he (district attorney) was ever charged with a crime and was innocent he would never file such a plea. That the filing of the same was equivalent to an admission of guilt. That the law was enacted for the benefit of the young men and did not apply to old men like the defendant." Of course, it was improper for the district attorney to say "that the filing of such a plea was equivalent to a plea of guilty," but it was not such error that an instruction by the court that it was improper and that the jury should not consider it, would not have cured the error. Appellant requested no such instruction be given, and presented no special charge in regard thereto, consequently it presents no such error as will necessitate a reversal of the case. District attorneys should never use such remarks. The suspended sentence law was thought to be a humane provision of law, which might work a reform of first offenders and make of them good and useful citizens, and it applies to old as well as to young men. One may be innocent of any wrongdoing and yet recognizing the strength of the net the State has woven about him, naturally fear the result. There is often a combination of circumstances, which a man innocently walks into, that he may not be able to explain satisfactorily to a jury, and yet never have thought of the commission of a crime. Under such circumstances he can and should seek to take advantage of this law, and no improper motive should be ascribed to him for so doing; for if it is permitted to be done, the innocent would be denied the privilege of asking the benefit of the law. One charged with crime naturally fears the result of a trial, although he may feel and know he is guilty of no wrongdoing, and had appellant excepted to the remarks and requested the court to instruct the jury that the remarks were highly improper, and then presented a charge instructing the jury not to consider such remarks, and the court had refused to give such instruction, we would not hesitate to reverse the case because of the improper remarks. For it is the duty of each and everyone connected with the trial, the trial judge, the prosecuting attorney, and the attorney representing the defendant, to use their best endeavors to see that a fair and impartial trial is had, and each issue fairly presented. Appellant's counsel must be diligent, as well as the others, for if he is not, he can not well complain of the matter after it is too late for it to have been remedied, when he could have had it remedied by prompt action.

No exception was reserved to the charge as given, no special charges were requested, and as there was no error in the rulings of the court in admitting evidence, the judgment must be affirmed.

*Affirmed.*

·DAVIDSON, JUDGE.—·I can not agree to this affirmance and may write on rehearing.

[Motion for rehearing withdrawn October 4, 1915.—Reporter.]

DAVIDSON, JUDGE (dissenting).—When the opinion was handed down affirming this judgment, I noted a disagreement to that affirmance. I do not propose to enter into any lengthy discussion of the matters involved, but in a general way to state a few reasons why I can not agree.

This record makes it manifest, as does the opinion, that a great deal of the testimony introduced—and this over the objection of the appellant—were remarks of appellant's wife and conversation had by her with other parties in his absence. This was introduced by the State as original testimony and for the purpose of showing a conspiracy between appellant and his wife. The wife can not be used as a witness against her husband in Texas in cases of this character. Under all of the authorities that have been called to my attention the declaration of the husband or wife can not be used against the other to show a conspiracy or to make out the State's case. In the Cook case, 22 Texas Crim. App., 511, there was some testimony introduced and the ruling of the trial court sustained on the theory that it was res gestae; but an examination of that case will show clearly this case does not come within that rule. Cook and his wife were acting together at the time of that homicide, actually personally engaged in it, and the acts and declarations of each made at the time were held to be admissible. I do not question the soundness of the Cook case, and if these declarations of the wife and her husband would come within that rule, I should not have disagreed here. But here the presence of the husband is excluded and, in fact, at the time she made these statements prior to the shooting, the meeting of the assaulted party with his wife was not known to defendant nor did the matters occur until appellant's wife discovered the presence of the assaulted party and went to him and had those conversations which were introduced in evidence. The meeting ·between appellant's wife and the assaulted party was purely accidental and unknown to appellant. I do not care to follow this thought further.

Another proposition germane to this, which I am convinced is correct, is that there can not be a conspiracy between the husband and the wife as the term "conspiracy" is understood in law. That they may be principals in a criminal case may be conceded. This would depend on the facts. At common law the wife, of course, could not be a conspirator with her husband. In Texas the statute provides that where an offense is committed by the wife in the presence or with the connivance of the husband, the wife is punished differently from her husband. This is not the rule as to conspirators. They are all punished alike. A conspiracy is a consummated offense and complete within itself, and the conspirators acting together are conspirators, whether the

object of the conspiracy is ever executed or not. This is true by the express definition of conspiracy in our Penal Code. So under our statute and under the common law both, a wife can not be a conspirator. This does not change the rule that she may be a principal subject to the statutory provision that her punishment may be different from that of her husband. It occurs to me this was recognized in this case because the wife was not prosecuted. Under any view, therefore, the exceptions to the introduction of these declarations of the wife against her husband, used by the State over the protest of the defendant, are well taken and should have been sustained. I do not care to cite authorities to sustain these propositions further than above mentioned.

There are some other errors in the case but I decided to make these few observations with reference to this phase of the case. I can not, therefore, believe that this conviction ought to have been sustained. The judgment ought to have been reversed and the cause remanded for trial in accordance with the principles of law.