M. H. BIBB v. THE STATE.

No. 4750. Decided June 26, 1918.

1.—Murder—Character of Female—Evidence—Insulted Female—Statutes Construed.

While the statute provides that the general character of the insulted female may be investigated, in order to ascertain the extent of the provocation, this does not prevent the introduction of specific acts of insulting conduct or illicit relations, and where defendant was seeking a reconciliation with his wife, with whom deceased carried on illicit relations, and killed the deceased while in the act of renewing such relations, the question of manslaughter is not eliminated, especially where the State proved these matters and failed to show matters in extenuation, and the last insulting conduct, rather than the prior conduct of deceased, must form the basis of the homicide.

**2.—Same—Charge of Court—Manslaughter—Weight of Evidence.**

Where, upon trial of murder, the evidence showed that the homicide occurred during an illicit meeting between the deceased and defendant's wife in which the defendant overtook them and killed the deceased, a charge of the court that if the jury believed that the killing was done not on account of any insulting act or improper conduct of deceased towards defendant's wife as a provocation, but from hatred or revenge and in pursuance of a design previously formed when defendant's mind was sedate and deliberate, the killing would not be manslaughter, was on the weight of the evidence and reversible error. Following Ratigan v. State, 38 Texas Crim. Rep., 301, and other cases. Prendergast, Judge, dissenting.

**3.—Same—Evidence—Contents of Letter—Privileged Communication—Predicate.**

Upon trial of murder, where the evidence showed that defendant came to the witness and secured him to write a letter directed to defendant's wife, the contents of this letter, without laying a proper predicate for the introduction of secondary evidence should not have been introduced, although its exclusion could not have been claimed on the ground of privileged communication between husband and wife.

**4.—Same—Evidence—Immaterial Circumstance.**

Where, upon trial of murder, the evidence showed that the deceased and defendant's wife were watched by the defendant in their illicit relations, testimony that two officers appeared on the scene should not have been admitted in evidence, there being no connection shown with the transaction.

**5.—Same—Evidence—Res Gestae.**

Upon trial of murder, there was no error in admitting testimony that about the time of the homicide in which defendant killed deceased while in illicit relations with defendant's wife, the witness heard a voice saying, "Oh! Daddy, why did you do it?" This was res gestae and was a question for the jury. Davidson, Presiding Judge, dissenting.

**6.—Same—Husband and Wife—Res Gestae.**

Upon trial of murder, there was no error in admitting testimony of a witness showing the res gestae statement of the wife of the defendant shortly after he had killed deceased to the effect that defendant had killed him, etc., and this does not come within the inhibition of the statute which prohibits the wife from giving testimony against the husband. Following Robbins v. State, 73 Texas Crim. Rep., 367, and other cases. Davidson, Presiding Judge, dissenting.

**7.—Same—Evidence—Scene of Homicide.**

While not perhaps reversible error, yet unless relevantly shown, testimony descriptive of the blood and other conditions manifesting themselves upon the scene of the homicide on the morning thereafter, should not have been introduced in evidence.

Appeal from the District Court of Tom Green. Tried below before the Hon. C. E. Dubois.

Appeal from the conviction of murder; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*W. A. Anderson,* for appellant.—On question of introducing letter: Ballard v. State, 71 Texas Crim. Rep., 587, 160 S. W. Rep., 716; Harris v. State, 72 Texas Crim. Rep., 117; James v. State, 40 id., 190.

On question of introducing testimony of wife of defendant: Thomp-

son v. State, 77 Texas Crim. Rep., 417, 178 S. W. Rep., 1192; Norwood v. State, 192 S. W. Rep., 248.

On question of court's charge: Cases cited in opinion.

*E. B. Hendricks,* Assistant Attorney General, for the State.

DAVIDSON, Presiding Judge.—Appellant was awarded a life sentence for murder. The case is a little peculiar in that appellant introduced no evidence. The entire record is made upon the State's theory. The killing occurred, under the State's evidence, on account of the familiarity of the deceased, Stokes, with appellant's wife. This evidence was introduced by the State, and then sought to be evaded by reason of the fact, or by evidence to that effect, that appellant's wife had been criminally intimate with other men prior to this relation with Stokes, and had prior to this particular occasion been intimate with Stokes; that appellant was aware of these matters, and, therefore, the killing was not manslaughter but murder. The State's case was in the nature of confession and avoidance. There is no reason shown in this record for the killing except that Stokes was familiar with appellant's wife. Appellant and his wife lived at Paint Rock, in Concho County; that she left him and went to San Angelo, Tom Green County, and became familiar with Stokes and filed a suit for divorce. Appellant ascertained this and at once went to San Angelo, disturbed and outraged. He talked to different people, among others a justice of the peace, county attorney and the sheriff. He was unacquainted with Stokes, but finally managed to secure an interview in which Stokes promised him that he would cease his attention to his wife. It is also shown that appellant stated that if Stokes did not let his wife alone he would kill him. Appellant left San Angelo. Later, ascertaining that Stokes had renewed his intimacy with his wife, he returned to San Angelo. His wife was stopping at a hotel, which fact appellant ascertained. The State's theory was that he sat on the opposite side of the street and discovered the fact that Stokes came to the hotel to see his wife. Stokes and appellant's wife left the hotel, probably with knowledge on the part of appellant that they were leaving it in company with each other. Appellant went to some point in the city and secured a gun. At the intersection of the street where his wife and Stokes had cut across a corner of the street near a sign board appellant met them. The killing occurred.

It is not the purpose of the writer to enter into a discussion of the statutes with reference to what constitutes manslaughter in connection with the stated facts. Insulting conduct towards the wife of the slayer is always adequate cause by the statute. The fact that she may have been a woman of loose character is admissible in connection with the homicide under the terms set out in the statute. Insulting words or conduct of the person killed towards a female relation of the party guilty of the homicide is the fourth ground of adequate cause set out

in article 1132 of the Revised Criminal Statutes. The following article provides that when it is sought to reduce the homicide to the grade of manslaughter the killing must occur immediately upon the happening of the insulting conduct, or soon thereafter as the party killing meet with the party killed, after having been informed of such insults. Article 1134, P. C., provides that in every case where the matter spoken of in the preceding article is relied on, it shall be competent to prove the general character of the female insulted, in order to ascertain the extent of the provocation; and under such circumstances, under article 1135, the jury is at liberty to determine whether under all the circumstances the insulting words or gestures were the real cause of the killing. While the statute provides that the general character of the insulted female may be investigated, in order to ascertain the extent of the provocation, this does not prevent the introduction of evidence of specific acts of insulting conduct or illicit relations. Enough has been said to show the illicit relations between Stokes and appellant's wife; that appellant had interviewed Stokes and obtained from him a promise to let his wife alone. Appellant was seeking a reconciliation with his wife and prevention of the divorce. Relying upon this he left San Angelo and was soon informed of the renewed relation between the parties, and having ascertained they were together that night, secured a gun and upon meeting them in company with each other immediately shot and killed deceased. This is the case in a nutshell. This does not eliminate the question of manslaughter, and not only so, but the State, not the defendant, proved these matters and was bound by them, unless the State could in some way avoid the force and effect of the testimony which brought in the extenuation. Whatever may have been the effect upon appellant's mind prior to the night of the killing, the authorities are pretty clear and seem all sufficiently explicit to sustain the proposition that under such circumstances the killing will be imputed to the last insulting conduct rather than to prior acts or conduct or previously occurring matters. Miles v. State, 18 Texas Crim. App., 156. See volume 5, Rose's Notes, page 451, for enumeration of cases. It seems practically certain from the evidence that had Stokes not renewed his illicit relation with appellant's wife, this killing would not have occurred, and it was on account of these illicit relations and his meeting him at the time he did, together at night, that induced appellant to do what he did.

There are quite a number of bills of exception reserved, and there are exceptions to the court's charge, which were timely reserved. Among other things, objection was made to the following charge:

"You are further charged that if you believe that the killing was done not on account of any insulting acts or improper conduct of deceased towards defendant's wife, as a provocation, but from hatred or revenge and in pursuance of a design previously formed, when defendant's mind was sedate and deliberate, the killing would not be manslaughter."

Several exceptions were reserved to this. We think the exceptions were well taken. This is a charge upon the weight of evidence, and the writer is of opinion upon an issue not raised by the facts. It had a tendency to deprive the defendant of the benefit of the State's case which showed manslaughter, and deprived him also of the benefit of the reasonable doubt between the offense of manslaughter and murder. The court by this charge indicates his view of the testimony, and it. might be seriously doubtful if manslaughter should be considered by the jury. It is true that if the killing occurred from malice, hatred and revenge, which shows a deliberate and wilful purpose to do the killing, it might not be manslaughter, although adequate cause may exist, but this is a matter always under the facts to be determined by the jury and not by the court. If the testimony with reference to the relation between Stokes and appellant's wife on the night of the killing was eliminated from this record, the State would be without a shown cause, and at least without the cause the testimony was introduced to sustain. This testimony was introduced for no other purpose than to show that the killing was on account of the fact that Stokes had had such relationship with appellant's wife and was with her at the time of the tragedy. Not only is adequate cause shown by the facts, but it was put in only by the State. It was incumbent upon the State to overcome the effect of this testimony. As said before, the case is sui juris as well as sui generis in that the State proved a killing under the theory of manslaughter and then sought to disprove it. Usually we find the defendant interposing insulting conduct towards a female relative to reduce the homicide, but in this instance he remained silent, and the State assumed the burden of showing adequate cause, and much of the testimony was introduced over appellant's objection. If for no other reason than this the judgment should be reversed. Art. 794, C. C. P.; Ratigan v. State, 33 Texas Crim. Rep., 301, 26 S. W. Rep., 407; Jones v. State, 101 S. W. Rep., 993; Thompson v. State, 77 Texas Crim. Rep., 417, 178 S. W. Rep., 1192; Norwood v. State, 80 Texas Crim. Rep., 552, 192 S. W. Rep., 248.

Bill of exceptions No. 1 recites that while the witness Marshall was testifying for the State he stated appellant came to his, Marshall's, office in the village of Mertzon and secured him to write a letter directed to appellant's wife. This letter was written by Marshall, and then follows the substance of the letter. He handed the letter to appellant. What became of it he was not aware. This letter was not introduced in evidence, but the State undertook to prove its contents by Marshall. The court, explaining this bill, states that Marshall wrote the letter for appellant, and after signing it as a witness delivered it to appellant, and by the witness Mrs. Gaskins the letter was shown to afterward be in the possession of Mrs. Bibb, the wife of defendant; and after the testimony was closed and while W. A. Anderson, counsel for defendant, was arguing the case, he stated that he then had the letter in his pocket. The court says it, therefore, appears from the facts that the letter was beyond the reach of the State to procure the same as evidence upon the

trial of this cause.  This is the reason he permitted the contents of
the letter to go before the jury.  We are of opinion, even in view of the
explanation by the court, which we think intensifies the error, the con-
tents of this letter under the circumstances were not admissible.  There
was not sufficient predicate for this ruling of the court.  The State
could have produced this letter or made an attempt to do so, because it
was known where the letter was or where it could be found.  The ex-
planation of the judge makes this relatively certain.  Mrs. Gaskins was
a witness in the case or she would not have testified to what was stated
by the judge.  This testimony was evidently introduced by the State
to show that after this letter was written it in some way reached his
wife, and Mrs. Gaskins testified that she saw her with it.  There was
no request made to have the letter produced; no predicate laid for the
introduction of its contents; therefore we think this was error.

Another bill recites that just prior to the time that Stokes and ap-
pellant's wife left the hotel two officers came to the hotel.  Objections
were urged but overruled.  The court says, by way of explanation, that
at the time the deceased, Stokes, and Mrs. Bibb, appellant's wife, came
out of the hotel, appellant was on the opposite side of the street, on a
doorstep, watching and was there when the officers drove up in front of
him.  This would not make the testimony admissible.  If appellant
was sitting across the street watching Stokes and his wife, that could
be introduced, but this did not require or authorize the introduction of
evidence that officers came there about that time.  They were in no way
connected with this matter so far as the record is concerned, and the
bill of exceptions does not seek to so show.

Bill No. 5 recites that while Edwards was testifying and after having
located himself, he stated that he heard shooting, and was then asked
by the State: "Did you hear anyone saying anything or hear voices
immediately after the shooting?"  Objection was urged, and he was
permitted to testify that the voice said: "Oh, daddy, why did you do
it?"  Exception was reserved to this testimony, and we think it should
not have gone to the jury.  The court says the reason he admitted the
testimony the woman's voice, as testified by the witness, was in the
direction from which the shots came, and near the place where deceased
was killed.  We are of opinion that this does not come within the rule
of res gestae or in such way as to authorize its admission.  It was close
enough in time, but was not sufficiently identifying in its statement.  It
was too indefinite.  It was not shown to have been the defendant to
whom the remark was made.  It is not sufficiently connected with the
shooting, in our judgment, to render it admissible.

Another bill recites that while Mrs. Gaskins was testifying for the
State this occurred: "We offer the same proposition as we did before
noon—the res gestae statements made by Mrs. Bibb just a few minutes
after the killing,—just time enough to walk across to the corner, being
excited and agitated and her clothing being very much disarranged."
Appellant objected to such statements made by the wife of defendant

because not a part of the res gestae; that it was an attempt to use the testimony of the wife against her husband; not at the place of the homicide, not in the presence of defendant, and, therefore, not admissible. Mrs. Gaskins was permitted, however, to testify: "I think she had just about time enough to walk over there. . I guess the distance to be 200 yards—her cloak was gone and her little bow tie which she wore about her neck." Then, to make the bill intelligible, the following occurred: "Q. Now, Mrs. Gaskins, at the time the statement was made by Mrs. Bibb, Mr. Bibb was gone? A. He had just turned from the door and gone. Q. And the door was closed? A. I don't remember—I believe the door was closed. Q. It was cold weather, wasn't it, and you had a fire in the stove? A. No, I don't think we had any fire on that night. Q. Isn't it a fact that you remember a blizzard had blown up that evening, the 6th of December, and that it was very cold that night? A. Mrs. Bibb was sitting on the porch at one time of the night, but I don't remember just when it was. Q. Didn't Mrs. Bibb give you a coat that she was carrying at the time? A. Yes, sir; she brought the cloak in—it was off when they came in. Q. Now, you think it was something like 200 yards from the place of the homicide to your house? A. I am guessing at that—I don't know. Q. And it was not exceeding ten minutes time after the shooting that she made the statement to you? A. I think that—of course I am not sure about it. Q. And she and her husband had brought the gun and left it there with you? A. Yes, sir. Q. Who handed you the coat, Mr. Bibb or Mrs. Bibb? A. I can't remember—I was kinder excited—I can't say positively who did. Q. Who handed you the gun? A. I think Mrs. Bibb had the gun. Q. After all this occurred was when the statement was made by Mrs. Bibb? A. Yes, sir. Q. And Mr. Bibb was gone? A. Yes, sir. Q. Who was present besides you and Mrs. Bibb? A. I don't remember that there was anyone else there."

The witness was permitted to testify, over objections, as follows: "Mrs. Bibb was carrying the gun—I took the gun and set it back in another room, where it remained till the officers came and got it. I do not know what officer took it. I was kinder scared of it. Mr. Bibb and Mrs. Bibb just came to the house—they did not come in—she came in but he didn't—he just turned and walked out back across the street— she came into the house and remained there. Mrs. Bibb seemed to be much excited; she was taking on, crying and talking—she had not entirely quit screaming when she reached my hotel—she was talking— she was screaming practically till she got to the hotel. When she got to the hotel she was talking. She said to me: 'He has killed him— he just tore me away from him—just knocked him away with his gun.' She appeared much excited."

We are of opinion that the statement of defendant's wife to Mrs. Gaskins with reference to what her husband did, as set out above, was not admissible. She did not testify on the trial. The wife could not have so testified. She could not have been used as a witness against

the defendant, because the statute has so provided. Art. 795, Vernon's Ann. Crim. Stats., p. 727. This statement was made by the wife some time after the shooting and some distance from the scene of the homicide, made in the absence of the defendant. The husband and wife can not be used as witnesses against each other except where the offense is against one by the other. This was not an offense against her. This is shown by the testimony. The law of res gestae does not meet the situation. The doctrine of res gestae, or any other rule of evidence laid down by the court, can not overturn constitutional or statutory demands or requirements. We understand that any statement made by a party at the time of the killing, or exclamations of a party, may be testified to by other witnesses or those who heard it. The wife could not have been placed on the stand in this case to testify to acts and conduct of her husband and deceased at the time of the homicide so far as the State is concerned. The defendant might have used her, but the State is prohibited from doing so. The statements between husband and wife overheard by other parties may be used in evidence; it is held not to be violative of article 794 with reference to privileged communication, but if those communications are made by the husband to the wife, or the wife to the husband, they can not be testified by either the husband or wife, for this is inhibited as privileged. The rule seems to be well settled that where the communications or statements are made by one to the other, they are privileged. If these communications or statements are heard by third parties, the third parties may testify to the fact in that state of case. The authorities upon the above proposition are collated in Vernon's Ann. C. C. P., p. 726, where also will be found article 794, supra. Suppose the wife had not been immediately present and saw her husband kill deceased, but directly afterwards and within five minutes he had stated to her he had killed deceased, and his wife had then subsequently told a third party that her husband made such statement or confession, it would not be contended under any rule that this communication would have been admissible. But if a witness had overheard the confession by the accused to the wife under the case stated, that witness could testify to the communication, but the wife could not. It would be as to her privileged. The statement made by appellant's wife to Mrs. Gaskins was in his absence and of which he was unaware, and it was a statement of the wife to a third party out of the hearing and away from her husband. There is a difference between the exclamations of the wife at the time of the homicide heard by others and to which they could testify and her statements to others after the killing. The third party could testify to what he heard, but the wife would not be permitted to state what she said under the above articles 794 and 795. The law seems to be well settled that when the wife can not testify to the transaction for the State, that her statements to third parties in the absence of defendant can not be used. See Gant v. State, 55 Texas Crim. Rep., 284; Spivey v. State, 45 Texas Crim. Rep., 496; Gross v. State, 61 Texas Crim. Rep., 176. We are of opinion under the objec-

tions urged this testimony was not admissible, and the court erred in not excluding it. We might also refer to Thompson v. State, 79 Texas Crim. Rep., 478, 178 S. W. Rep., 1192, and Norwood v. State, 80 Texas Crim. Rep., 552, 192 S. W. Rep., 248.

There is another bill of exceptions to which reference will be made. After Charles Hull had testified for the State, and after testifying to hearing the shot that was supposed to have killed Stokes, he was re-called by the State and asked whether or not the next morning after the shooting (the shooting is shown to have occurred about 9 or 10 o'clock December 6, 1916) he had examined the place of the homicide and the building on the opposite side of the street, and to describe the blood on the ground and the gunshot signs on the building on the opposite side of the street. Various objections were urged to all this, but the witness testified that next morning after the shooting he went to the place where the deceased fell and there was a large bloody place there on the ground and that he then went across the street and examined gunshot scars on the building on the opposite side of the street, describing them in detail. This bill is signed without qualification. There is no reason assigned by the State why this testimony was sought or should be introduced. There was no question of the fact that appellant killed deceased. The cause for the killing is not challenged by defendant but proved by the State. The environs of the case all show that it was at a particular place appellant killed deceased. The examination of these locations of the building and scars on the building supposed to have been made by bullets or gunshots served no useful purpose in making out the State's case. The fact that deceased was killed was not debatable; the fact that he was shot by defendant was not denied; that he was shot by a shotgun was made evident. These matters were prejudicial to the defendant and should not have been permitted. There are quite a number of cases analogous to the question and involving the same principle. See Lacoume v. State, 65 Texas Crim. Rep., at p. 146; Corley v. State, 69 Texas Crim. Rep., 626; Gillespie v. State, 80 Texas Crim. Rep., 432; Williams v. State, 61 Texas Crim. Rep., 356, 136 S. W. Rep., 771; Cole v. State, 75 S. W. Rep., 527; Melton v. State, 83 S. W. Rep., 822; Christian v. State, 79 S. W. Rep., 562; Lucas v. State, 95 S. W. Rep., 1055.

For the reasons indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, JUDGE, dissenting.

MORROW, JUDGE (concurring).—I concur in the criticisms made by the Presiding Judge in the opinion touching the paragraph of the charge mentioned. Appellant having acquainted a third party with the contents of a letter to his wife, which is referred to in bill of exceptions No. 1, by procuring another to write the letter, I think its contents should not be rejected on the ground of privileged communication. I believe, however,

there was a failure to establish a sufficient predicate to justify the introduction of secondary evidence of the contents of the letter.

With reference to the expression, "Oh, daddy, why did you do it?" referred to in bill of exceptions No. 5, I think that, if used by Mrs. Bibb, it was res gestae, and, whether it was used by her or not, was a question for the jury, and its introduction would not require a reversal.

The alleged statement by Mrs. Bibb, testified to by Mrs. Gaskins, I think was res gestae and admissible as coming within the rule relating thereto. Being res gestae and testified to by another than appellant's wife, it does not come within the inhibition of the statute which prohibits the wife from giving testimony against the husband. It is not her testimony that is used, but her verbal act so connected with the transaction as to become a part of it, and provable by competent witnesses like any other part of the transaction. See Robbins v. State, 73 Texas Crim. Rep., 367; Cook v. State, 20 Texas Crim. App., 511; Wharton, Crim. Ev., secs. 252-253.

So far as developed in the bill of exceptions complaining of the testimony of the witness Hull, descriptive of the blood and other conditions manifesting themselves upon the scene of the homicide on the morning thereafter, their relevancy is not disclosed. As the record is presented I would not feel disposed to concur in a reversal because of the facts shown by this bill alone, but unless on another trial the matter becomes relevant to some issue it should not be introduced.