## C. E. GILMORE V. THE STATE.

### No. 6554. Decided February 1, 1922.

**1.—Murder—Provoking Difficulty—Charge of Court—Acts of Deceased.**

Where, upon trial of murder, the evidence showed that the difficulty between the parties did not begin with the blows by defendant, but that the quarrel was initiated by the deceased, the court's charge on provoking the difficulty, that if defendant just prior to the time he shot and killed the deceased struck the deceased and that he did so for the purpose and with the intent of provoking the deceased to attack him, etc., was reversible error. Following McCandless v. State, 42 Texas Crim. Rep., 58, and other cases.

**2.—Same—Threats—Charge of Court—Self-Defense—Requested Charge.**

Where no reference to threats made by the deceased and communicated to the defendant was made in the charge of the court, either separately or in connection with the paragraph on self-defense, and the charge as requested seeking to correct it, was refused, same was reversible error. Following Penton v. State, 53 Texas Crim. Rep., 323, and other cases.

**3.—Same—Charge of Court—Party Acting With Deceased—Requested Charge.**

Where the conduct of the party acting with the deceased in the conflict was such as to require the court upon request to instruct the jury in the manner that they would understand that if viewed from defendant's standpoint he was in danger of the party acting with deceased, he might embrace both in his defensive efforts should have been given. Following Stacy v. State, 48 Texas Crim. Rep., 95.

**4.—Same—Evidence—Res Gestae—Husband and Wife—Silence of Defendant.**

Upon trial of murder, there was no error in admitting in evidence the statement of defendant's wife, who exclaimed immediately after the shooting: "You told me you were going to kill him, and now you have killed him," addressing said remarks to defendant. This was *res gestae* and not a privileged communication, and in the nature of an accusation in which defendant's acquiescence might be inferred from his silence. Following Cole v. State, 48 Texas Crim. Rep., 439, and other cases.

**5.—Same—Evidence—Declarations and Acts of Defendant—Suspended Sentence.**

Upon trial of murder, testimony of circumstances tending to show that defendant was on terms of intimacy with a certain woman referred to by the deceased, in his conversation with defendant's wife, was admissible on the question of the relations of the parties, but not on the issue of suspended sentence. Following Baker v. State, 87 Texas Crim. Rep., 305.

Appeal from the District Court of Marion. Tried below before the Honorable R. T. Wilkinson.

Appeal from a conviction of murder, penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

*T. D. Rowell, I. C. Underwood,* and *French & Price,* for appellant.—On question of provoking difficulty: Alexander v. State,

7 S. W. Rep., 867; Kilpatrick v. State, 189 id., 267; Cartwright v. State, 14 Texas Crim. App., 486.

On question of self-defense: Welborn v. State, 179 S. W. Rep., 1179; Williams v. State, 136 id., 771; Carr v. State, 190 id., 727.

On question of threats: Lee v. State, 113 S. W. Rep., 301; Fielding v. State, 48 Texas Crim. Rep., 334; Thompson v. State, 85 id., 144.

On question of *res gestae* and husband and wife: Johnson v. State, 27 Texas Crim. App., 135; Overton v. State, 43 Texas, 616.

*R. G. Storey,* Assistant Attorney General, for the State.—On question of provoking difficulty: Matthews v. State, 42 Texas Crim. Rep., 31; Meuly v. State, 26 Texas Crim. App., 274; Franklin v. State, 30 id., 628.

MORROW, Presiding Judge.—The judgment appealed from condemns appellant to confinement in the penitentiary for a period of twenty years for the offense of murder. Appellant shot and killed Lunsford Warrick. Besides murder, the issues of manslaughter, self-defense and provoking the difficulty were submitted.

Appellant was a son-in-law of C. I. Boules and resided at his hotel. The deceased was also his son-in-law.

There was evidence that the deceased and Pete Boules, a son of C. I. Boules, had told the appellant's wife that his relations with a certain woman domiciled in the Todd Cottage were improper. The truth of this was denied by the appellant, and the relation of it was resented by him. His wife, upon investigation of the matter, became satisfied that it was unfounded. She persuaded the young woman in question, however, to return to her home about twelve miles distant, and took her there in appellant's automobile. Appellant, upon learning of his wife's intention, followed and overtook her. She was also followed by C. I. Boules and the deceased. These parties met on the public road, and an altercation took place. Boules exhibited a pistol, Warrick, a knife, and appellant, according to some of the evidence, a pistol. On returning, Boules informed appellant that he could no longer reside at his home. Appellant and his wife agreed to depart and got in their automobile with that declared intention. They stopped at Hale's Garage in the town where they all resided and obtained some oil and water for the car. While there, Pete Boules and the deceased appeared, and the homicide took place.

It was the State's theory that appellant acted upon malice engendered by the reports of his conduct made to his wife by the deceased and Boules.

Appellant was a constable and claimed to have caught the deceased and Pete Boules violating the liquor law; that they made demonstration of arms against him and threats in the event he revealed their conduct. There is other testimony that later the deceased declared that appellant must leave town before the grand jury met and made threatening declarations against him.

The theory advanced by the appellant is that his conduct was defensive and made necessary by the aggression of the deceased and his companion, Pete Boules, and that they were inspired by the desire to prevent his divulging their law breaking before the grand jury.

There were a number of eyewitnesses to the homicide. Pete Boules, for the State, said that he and Warrick went to the garage without the knowledge of appellant's presence; that Warrick began the conversation and inquired where appellant and his wife were going, to which appellant replied that they were going to leave town but would return the following day. The deceased said: "You wanted me to two-time something, and now I am ready to do it." Appellant asked him to go on, stating that they were going away. The deceased repeated his remarks, when appellant got his gun and said: "I came here to kill him and I am going to do it." His wife called for help. Appellant walked to the curb and Warrick stepped in front of him and renewed his remark and said: "I can two-time anything you want me to, and slap you in the mouth while I do it." Appellant said: "Don't touch my wife," when deceased struck him with a stick and appellant shot.

Several witnesses for the State, who were present, described the occurrence in the main coinciding with that of Boules, but some related additional facts and controverted some of the declarations imputed by Boules to appellant. One of them, Hale, responding to the request of Mrs. Gilmore for help (she at the time being between the appellant and deceased attempting to interfere) when Pete Boules, who was present, directed that he let them alone as it was a family trouble; that the deceased pushed appellant's wife away, when appellant shook his finger at him and said: "Don't push my wife." The deceased pushed her again and appellant slapped him with his right hand. The witness saw nothing in his hand. The deceased struck appellant with a stick and appellant shot.

According to the testimony of appellant and his wife, the deceased told appellant that he had to whip or kill him before leaving town; that he (deceased) was going to two-time what he had said; that after being told that they were going to leave town and wanted no trouble; the remarks of the deceased were in substance repeated. Appellant said he would fight him like a man if there was nothing else to do, and got out of the car, when deceased started toward him. Appellant

turned in another direction, but the deceased confronted him. Appellant's wife sought to interfere and called for help, and when Hale responded, Boules commanded him to desist. Appellant said that when Boules pushed Hale back, the deceased pushed appellant's wife and said: "Damn it, get back;" that appellant remonstrated with him and he again pushed his wife. When appellant's wife said to appellant: "Don't get your gun," Boules said: "Damn him, let him have his God-damn gun. He hasn't got the guts to use it." On pushing the wife back, the deceased raised the scantling to strike, and when he struck, appellant drew his gun and fired.

The expressions of the deceased about "two-time" were repetitions of the language used· in the previous encounter upon the same day when deceased and his father-in-law and appellant had an altercation. It was explained that by the term "two-time" it meant repeat, and in the previous altercation, the matter of deceased connection with the report of appellant's wife was called in question.

There was testimony that at that time appellant said, in substance, that he was too slow but he would not be in a subsequent occasion.

The propriety of charging on the law· of provoking the difficulty and the manner of so doing is questioned. At· the time of the meeting at which the homicide took place, the evidence is uncontroverted that there was ill-feeling between the deceased and the appellant. At an earlier hour upon the same day, an encounter had taken place in which the deceased, in company with C. I. Boules, exhibited weapons in a threatening manner and used insulting language towards the appellant. In the same altercation appellant participated, he also, according to some testimony, exhibited a weapon. Following this, the appellant quit the home of C. I. Boules and was in the act of going with· his wife away from the town. The deceased and his companion, Pete Boules, approached them. From every angle, the testimony shows that· from the beginning, the attitude of the deceased was hostile and his language insulting. From some of the testimony, his demand that appellant fight him was imperative. Appellant, responding to the request of deceased, got out of his car. The words and conduct of the deceased continued threatening and insulting. The deceased was possessed of a piece of timber. Appellant's wife sought to interpose, and upon her solicitation bystanders sought to do so, but were prevented by Pete Boules, the companion of the deceased, who was also hostile to the appellant. It was under these circumstances that the blows began to fall. According to some of the state's testimony, appellant first struck the deceased. Deceased responded, striking appellant with a stick and was shot by the appellant.

The court, in his charge, treated the blows as the beginning of the difficulty. In his charge, the court said: "Now, if you believe from the evidence beyond a reasonable doubt that the defendant, just prior to the time he shot and killed the deceased, struck the deceased, and if you believe from the evidence beyond a reasonable doubt that he did

so for the purpose and with the intent of provoking the deceased to attack him so that he might have a pretext for killing the deceased, etc."

As we conceive it, the difficulty did not begin with the blows. The quarrel was initiated by the deceased. His manner and language following the previous encounter upon the same day and viewed in the light of the evidence of communicated threats, demanded some defensive action on the part of the appellant. Even if the court was warranted in ignoring all that occurred antecedent to the striking of the blows, there was an issue of fact as to who struck first. From the state's standpoint, at this point appellant used a pistol and the deceased a heavy timber or stick. Viewed in this light, the case apparently would not come within the law requiring a charge upon provoking the difficulty. That issue arises when the deceased is the first assailant, and when his action results from some previous conduct or words of the accused, calculated and intended to provoke an attack, but does not arise when the controversy is who began the attack. Burnett v. State, 51 Texas Crim. Rep. 21; Carlile v. State, 232 S. W. Rep. 822; Branch's Crim. Law., sec. 466.

The words and conduct of deceased, including his previous threats, as bearing upon the law of provoking the difficulty, were eliminated by the charge given. Moreover, the conduct of Pete Boules as an actor in the difficulty was an element in the issue of self-defense ignored in the charge. There is evidence from the witnesses of both the State and the appellant that Boules was an actor in the tragedy, at least, to the extent of deterring bystanders from preventing the conflict. He was an enemy of the appellant, and according to the appellant's theory, was a co-actor with the deceased in the violation of the liquor laws. The jury may have believed that the motives that actuated the deceased and Boules were identical. Their presence together, their conduct, and concert of action hostile to the appellant, were available in order that the jury might determine, from his standpoint at the time, the conditions that confronted him when the fatal shot was fired. It may be that in the difficulty he used undue force or acted with unwarranted haste. He may be culpable but in passing upon his guilt and measuring his punishment, we think the charge given upon provoking the difficulty was not warranted. McCandless v. State, 42 Texas Crim. Rep. 58; Lucas v. State, 49 Texas Crim. Rep. 135; Saens v. State, 20 S. W. Rep. 739.

In the state of the record and qualification of the law of self-defense by a charge upon the law of provoking the difficulty is of more than doubtful propriety. It would be extremely difficult to prepare such a charge and safeguard the rights of the appellant to act upon the appearances of danger growing out of the conduct of the deceased and his companion, Pete Boules, antecedent to the time that there were blows struck. No reference to threats made by the deceased and communicated to the appellant was made in the charge, either

separately or in connection with the paragraph on self-defense. This was complained of and special charges were requested seeking to correct it. According to appellant's testimony, at the time he discovered the deceased and Pete Boules violating the prohibition law, they each exhibited weapons, and Pete Boules said: "God damn you, if you tell on me I will kill you." There was evidence that about a week before the homicide, deceased said: "Gilmore has to leave town before the grand jury meets or I will put him out. If any other son-of-a-bitch like him wants to squeal on me, he had better get out of the way." This was communicated to the appellant.

Mrs. Gilmore testified that in the altercation occurring on the same day the deceased said: "Who has been telling these God damn lies on me will have to two-time," and he opened his knife, and C. I. Boules presented a pistol.

According to the appellant, when he informed the deceased that he was leaving town, deceased said: "You are not going anywhere until you two-time those God damn lies or whip or kill me;" that he said further: "I am ready to two-time those God-damn lies and slap you in the mouth. When appellant asked the deceased to let him alone and appellant's wife told him not to get his gun, both Warrick and Pete Boules said: "Let him get his God-damn gun. He hasn't got nerve to use it." About this time, Hale, responding to the appeal of Mrs. Gilmore, took hold of the appellant's sleeve, when Pete Boules shoved him back and said: "Get back, this is a family affair. Let the family settle it." Deceased pushed Mrs. Gilmore back and said: "Get back out of the way" and raised up a scantling and struck the appellant on the arm. According to appellant's testimony, he fired believing that Pete Boules intended to shoot him if the deceased did not knock him down. Under this evidence, we think the court should have charged on the law of communicated threats in connection with the law of self-defense. Penton v. State, 53 Texas Crim. Rep., 323; Thomson v. State, 49 Texas Crim. Rep., 384; Alexander v. State, 25 Texas Crim. App., 266; Branch's Crim. Law, Sec. 482.

The connection of Pete Boules with the conflict was such as to require the court, upon request, to instruct the jury in a manner that they would understand that if, viewed from his standpoint, the appellant was in danger from both Boules and the deceased, he might embrace both in his defensive efforts. Stacy v. State, 48 Texas Crim. Rep., 97, and other cases in Branch's Crim. Law, Sec. 450. The admissibility of the testimony to the effect that immediately after the shooting, Mrs. Gilmore, wife of appellant, exclaimed: "You told me you were going to kill him, and now you killed him" is challenged. It is insisted that the admission of this testimony was inhibited under the rule which excludes confidential communication between the husband and wife. We regard the contention as untenable. The declaration apparently was properly admitted as *res gestae*. Cole v. State, 48 Texas Crim. Rep., 445. It was not the use of the testimony

of the wife.  It was proved to be her declaration from the lips of another.  She would not have been a competent witness to testify to it but that fact does not render proof of her *res gestae* declaration inadmissible.  Cole v. State, 48 Texas Crim. Rep., 445; Cook v. State, 22 Texas Crim. App., 525; Thompson v. State, 77 Texas Crim. Rep., 417, 178 S. W. Rep., 1195; Robbins v. State, 73 Texas Crim. Rep., 367, 166 S. W. Rep., 529; Cole v. State, 51 Texas Crim. Rep. 89. Moreover, the wife's declaration ceased to be confidential when made in the presence of others.  Wharton's Crim. Evidence, Vol. 1, Sec. 398.  Mrs. Gilmore testified that the remark made was not that imputed to her, but that she exclaimed: "I asked you to help me, and you would not do it, and now he has killed Shorty, and it could have been avoided so easy."  There was evidence also that at the time appellant got out of the car, he said in the presence of his wife that he intended to kill the deceased.  Granting that she made the remark, as claimed by the State, it does not follow that it would be referable to any previous conversation or confidential communication with the appellant, but more naturally it would relate to that which took place immediately preceding the homicide in the presence of the bystanders. Her declaration, publicly made, was not denied by the appellant at the time.  It was in the nature of an accusation in which his acquiescence might be inferred from his silence.  For these additional reasons, we are of opinion that there was no error in receiving the testimony.

The complaint of the receipt in evidence of circumstances tending to show that appellant was on terms of intimacy with the woman referred to by the deceased in his conversation with appellant's wife is not tenable.  This evidence, however, we think, was not admissible upon the issue of suspended sentence.  Such use of it would carry inquiry into specific acts beyond legitimate bounds.  Williamson v. State, 74 Texas Crim. Rep., 289; Baker v. State, 87 Texas Crim. Rep., 305; Fountain v. State, No. 6451, not yet reported.  The evidence had legitimate bearing, however, upon the controverted issue as to the real cause of the unfriendly relations between the deceased and the appellant.  The alleged conduct of the deceased towards appellant's wife was a proper matter for the consideration of the jury on the general issue of manslaughter, but the court did not err in refusing to tell the jury that the insulting conduct toward the female relative of appellant would be adequate cause, as a matter of law.  The evidence, we think, does not raise that issue.

Other questions presented are such as will probably not arise upon another trial.  We pretermit a discussion of them.

For the reasons indicated, the judgment of conviction is reversed and the cause remanded.

*Reversed and remanded.*