M. H. Bibb v. The State.

No. 5309.  Decided June 4, 1919.

Rehearing denied October 29, 1919.

**1.—Murder—Manslaughter—Reputation for Chastity—Evidence.**

Where, upon trial of murder, defendant pleaded self-defense but contended that the State introduced evidence raising the issue of manslaughter and that it was bound thereby, and could not ask for a conviction of murder and was in no event authorized to introduce testimony of the bad reputation of the wife of the defendant, in order to rebut and overcome the theory of manslaughter thus raised by its own evidence, held, that such contention was untenable.

**2.—Same—Rule Stated—Manslaughter—Evidence—Malice.**

If, upon trial of murder, the State had introduced testimony from which a conclusion of manslaughter might be drawn, in whole or in part, it would not be compelled to rest its case there, or be precluded from showing that such testimony did not produce adequate cause and that the facts evidenced malice in the particular case and was murder.

**3.—Same—Rule Stated—Insult to Female Relative—Murder—Manslaughter.**

In the instant case if the State had seen fit to prove, as an original proposition, that defendant killed deceased because he was going with his wife who had sued him for divorce, this would in no sense have deprived the State of its right to proceed, if it could, to show that such killing was without passion or without the other indicia of manslaughter.

**4.—Same—Rule Stated—Insulting Conduct to Female Relative.**

In all cases where insulting conduct to female relative is relied upon to reduce the homicide to manslaughter, the character of the female in question is made an issue under the statute. Following Wood v. State, 31 Texas Crim. Rep., 571, and other cases. And where the testimony covered a period of time beginning some eight years previous to the homicide and extending back for several years it was not too remote.

**5.—Same—Rule Stated—Time Not Essential—Question of Fact.**

In determining how far this character of evidence may be removed from that of the offense to which such evidence relates, it is impossible to make any hard and fast rule, and it seems that when such evidence is admissible at all, the same should be allowed regardless of the time, this being a fact for the jury.

**6.—Same—Evidence—Reputation—Rule Stated—Place of Residence—Presumption.**

A witness or party whose reputation becomes issuable may rove from place to place without fixed residence, in which case his or her reputation

may be proven at any place where the witness or party lived long enough to establish one. Mynatt v. Hudson, 66 Texas, 66, and other cases, and the rule sustains the proposition that the reputation once established is presumed to remain the same until the contrary appears.

### 7.—Same—Evidence—Specific Instances of Immorality.

The defendant's contention that the trial court erred in admitting testimony of specific instances of his wife's immorality is sufficiently met by the fact that no objection was urged to any testimony upon this ground.

### 8.—Same—Requested Charges—Manslaughter.

Where the requested charges were either covered by the main charge of the court on manslaughter, or were on the weight of evidence, there was no reversible error in refusing them.

### 9.—Same—Manslaughter—Self-defense—Charge of Court.

Where, upon trial of murder, the court's charge on self-defense followed precedent as also his charge on manslaughter, and the evidence in the case was sufficient to sustain the conviction of murder, there was no reversible error.

### 10.—Same—Insult to Female Relative—Rule Stated—Unchastity.

The accusation of unchastity, made against the female relative, cannot be adequate cause to arouse the mind of a male relative who already knows the facts of such unchastity. Following Redmond v. State, 52 Texas Crim. Rep., 591, and other cases.

### 11.—Same—Manslaughter—Rule Stated—Insult to Female Relative.

Four things must appear in a given case of homicide to reduce the same to manslaughter where the defendant relies upon insulting conduct to a female relative. The occurrence of insulting conduct or words; proof that this was the real cause of the killing, and that the killing must have taken place immediately on the happening of the insult or soon thereafter as the accused met the insulter, and that his mind was affected to such an extent as would commonly render the mind of a person of ordinary temper incapable of cool reflection. Following Reagan v. State, 70 Texas Crim. Rep., 498, and other cases.

### 12.—Same—Insult to Female Relative—Rule Stated.

It seems not reasonable that a man made to be shown to have knowledge of the wife's criminal intimacy with any number of men, without any passion being aroused, that he would still be allowed to set up such intimacy with one other man as having produced uncontrolable passion, but even then, the other necessary elements must concur in order to reduce the homicide to manslaughter.

### 13.—Same—Manslaughter—Charge of Court—Insult to Female Relative.

Where, upon trial of murder, the court's charge on manslaughter, raised by the issue of insulting conduct by the deceased to defendant's wife, did not limit the jury to insulting conduct *ipso nomine* but allowed them to range through the entire evidence to find any condition or circumstance which is capable of creating and does create sudden passion, and instructs them that if from any such cause sudden passion arose and caused the killing it will be manslaughter, and further specifically calls their attention to such insulting conduct as adequate cause, the same was sufficient and there was no reversible error.

8—86 T. C. R.

**14.—Same—Insulting Conduct to Female Relative—Evidence—Rule Stated.**

Where, upon trial of murder, the defendant pleaded self-defense but also introduced evidence of his res gestæ statement made immediately after he killed the deceased that the deceased broke up defendant's family, this put the State upon notice that defendant would rely upon manslaughter also, and the State was privileged to prove the general bad character of defendant's wife for virtue, and defendant's knowledge of his wife's immoral conduct on specific occasions.

**15.—Same—Unchastity—Rule Stated—Manslaughter—Charge of Court.**

The proof of the unchaste character of defendant's wife did not take the issue of manslaughter out of the case, but the court's charge on this phase of the evidence was sufficient, and there was no error in refusing a requested charge on this subject. Davidson, Presiding Judge, dissenting.

**16.—Same—Rehearing—Reputation for Chastity.**

Where, upon rehearing, the appellant contended that this court erred in overruling his exceptions to the testimony as to the reputation for chastity of his wife on specific occasions, but the record showed such unchastity and also showed the defendant's knowledge of and consent thereto, there was no reversible error, although such conduct occurred many years before the homicide; there being no facts shown of a reformation of such conduct.

**17.—Same—Unchastity—Reputation—Manslaughter—Rule Stated.**

Where defendant claimed that the deceased broke up his family and that the killing resulted therefrom he had the right to have this issue submitted to the jury, but where the evidence also showed or suggested that defendant's wife was a prostitute and that he knew that fact and that it ordinarily raised in his mind no anger, rage, etc., these were matters for the jury to decide whether the killing resulted from malice or uncontrollable emotion, and the fact that such evidence covered a period of years might affect its weight but not its admissibility; there being no evidence to indicate any change in the character of defendant's wife, or that defendant showed any resentment thereto.

**18.—Same—Requested Charge—Manslaughter—Weight of Evidence.**

Where, upon trial of murder, the defendant pleaded self-defense but the evidence also raised the issue of insulting conduct to defendant's wife by the deceased, and showed criminal intimacy of said wife with deceased, etc., and the court gave a proper charge on manslaughter, there was no error of his refusal to submit defendant's requested charge on this issue, which was on the weight of the evidence and did not submit the law of the case.

Appeal from the District Court of Tom Green. Tried below before the Hon. C. E. Dubois.

Appeal from a conviction of murder; penalty, life imprisonment in the penitentiary.

The opinion states the case.

*Anderson & Upton,* for appellant.—On question of reputation of defendant's wife for chastity: Thompson v. State, 42 S. W. Rep., 974; Woodward v. State, 58 id., 135; McAnear v. State, 67 id., 117; Wilburn v. State, 77 id., 3; Mennefee v. State, 67 Texas

Crim. Rep., 201, 149 S. W. Rep., 138; Echols v. State, 75 Texas Crim. Rep., 369; 170 S. W. Rep., 786; McCue v. State, 75 Texas Crim. Rep., 137; 170 S. W. Rep. 280.

On question of refusal of defendant's requested charge: Tomlin v. State, 8 S. W. Rep., 931; Bowers v. State, 71 id., 284; French v. State, 85 id., 4; Wakefield v. State, 94 id., 1046; Yancey v. State, 76 id., 571; Woodward v. State, 58 id., 135; Davis v. State, 65 Texas Crim. Rep., 271; 143 S. W. Rep., 1161; Haggart v. State, 77 Texas Crim. Rep. 270; 178 S. W. Rep., 328; Long v. State, 208 S. W. Rep., 922; Streight v. State, 62 Texas Crim. Rep., 453.

*E. A. Berry*, Assistant Attorney General, for the State.—On question of *res gestae* statement: Bronson v. State, 59 Texas Crim. Rep., 17, 127 S. W. Rep., 175; Roberts v. State, 74 Texas Crim. Rep., 150, 168 S. W. Rep., 100; Gentry v. State, 152 S. W. Rep., 635; Baker v. State 79 Crim. Rep., 510, 187 S. W. Rep., 949

On question of wife's character on issue of manslaughter: Jones v. State, 51 Texas Crim. Rep., 472, 101 S. W. Rep., 993; Richards v. State, 53 Texas Crim. Rep., 400, 110 S. W. Rep., 432; Fox v. State, 71 Texas Crim. Rep., 318, 158 S. W. Rep., 1141, and cases stated in the opinion.

LATTIMORE, JUDGE.—In this case appellant was given a life sentence for murder, in the District Court of Tom Green County.

This is the second appeal, see 205 S. W. Rep., 135. The facts will appear in the opinion. The first ground of error urged is to proof of the bad reputation for chastity of appellant's wife. Two objections are presented: first, that appellant did not make the reputation of his wife an issue, and the State cannot; second, that the evidence was too remote in point of time.

Appellant's theory of the case, as presented in his brief, is that under the evidence he could be guilty of no higher degree of culpable homicide than manslaughter, and he further contends that the evidence raising the issue of manslaughter was introduced by the State and that in such case the State is bound thereby, and is not entitled to ask for a conviction of more than manslaughter, and that the State is in no event authorized to introduce the bad reputation of the wife, in order to rebut and overcome a theory thus raised by its own evidence. A proper determination of these matters depends upon the facts that appear in the record. The first witness for the State, Mr. Sheppard, lived near the scene of the killing, heard the shots, went in that direction, met appellant leading a woman and carrying a double barrelled shotgun, went on to the body of deceased which was lying between the sidewalk and a large bill-board which stood near, went back from the scene of the

killing and met appellant who told him that he did the shooting, etc. There was not a word in the direct testimony of this witness suggesting the theory of manslaughter, or that the killing was in any wise from a cause relating to the appellant's wife or any other female relative; but, at once, upon cross-examination this witness was asked by appellant and stated, that when he first met appellant he asked, ''What is the matter out here,'' and that appellant replied: ''I have had a little trouble with a fellow—he has broke up my family—broke it up twice, but he will never do it again;'' and that appellant told the witness that the woman was his wife.

Witness Grayson for the State, on direct-examination made no mention of the fact of appellant's wife figuring in the case, these facts being brought out on cross-examination by appellant. Likewise, Sheriff Allen for the State, gave no testimony raising the question of trouble between deceased and appellant, but on cross-examination was asked and stated that appellant had told him that he and his wife had had trouble and that he was trying to get her to come back to him but a man named Stokes was interfering, keeping him from it.

This much of the evidence is here set out to make clear the fact that the evidence, if any, raising the theory of manslaughter, was not brought out by the State.

We are of opinion, however, that if the State had introduced in evidence facts from which a conclusion of manslaughter might be drawn, in whole or in part, that it would not be compelled to rest its case there, nor be in any manner precluded from showing that such facts in the particular case, did not produce the passion and did not cause an encounter at the first meeting of the parties, and that the case lacked other evidences of manslaughter; and further, that such facts evidenced malice in the particular case, and that in truth the killing was murder and not manslaughter.

In the instant case, if the State had seen fit to prove as an original proposition, that appellant killed deceased because he was going with his wife, who had sued him for divorce, this would in no sense have deprived the State of its right to proceed, if it could, to show that such killing was without passion or without the other *indicia* of manslaughter. This will be discussed further in the opinion. Each of the four elements of manslaughter hereinafter referred to, must be shown by the State before appellant could claim the State bound, and even then the question would be for the jury.

Attention to, or acts toward, a wife, under our decisions, when relied on as cause to reduce the homicide to manslaughter, come under the head of insulting conduct toward a female relative and such acts may be adequate cause even though acceptable and pleasant to the wife or female relative herself.

In all cases where insulting conduct is relied upon to reduce the homicide to manslaughter, the character of the female in question is made an issue under article 1134, Vernon's P. C. See also Wood v. State, 31 Texas Crim. Rep. 571; Griffin v. State, 54 S. W. Rep., 586; Fox v. State, 71 Texas Crim. Rep., 318, 158 S. W. Rep., 1144.

The objectionable evidence covered a period of time beginning some eight years previous to the homicide and extending back for several years. Was such evidence too remote?

The same rule obtains in regard to evidence of this kind of reputation that applies to proving the reputation of a witness. Crane v. State, 30 Texas Crim. App., 464.

In determining how far the evidence may be removed from that of the offense to which such evidence relates, it is impossible to make any hard and fast rule, and it seems that when such evidence is admissible at all, same should be allowed regardless of the time, the probative force thereof, as affected by time, change or other circumstance, being for the jury. No court can arbitrarily say that a greater or less period shall be fixed and adopted; and this is too plain for discussion. A witness may live here and there and not be long enough in any one place to acquire a reputation. Coffelt v. State, 19 Texas Crim. Rep., 436; Crane v. State, 30 Texas Crim. App., 464.

A witness or party whose reputation becomes issuable may rove from place to place without fixed residence, in which case his reputation may be proven at any place where he lived long enough to establish one. Mynatt v. Hudson, 66 Texas, 66; Brown v. Perez, 34 S. W. Rep., 725; Clark v. Hendricks, 164 S. W. Rep., 47.

These cases and others might also be cited as sustaining the proposition that the reputation once established is presumed to remain the same until the contrary appears. In Clark v. Hendricks, 164 S. W. Rep., 57, Judge Fly says:

"Appellant was a rover from one community to another in and out of Texas. He had lived during his twenty-eight years of life in at least three States, in at least five counties, and numerous communities. Since 1907 he had been moving from one place to another. If appellant had any reputation it was formed in Hill County, where he lived longer than in any other county, and the reputation he formed there four or five years before the trial was not incompetent, especially as there was nothing to indicate that there had been any change for the better in his reputation. The time that had elapsed since the witnesses as to the reputation knew him may have gone to the weight, but not to the admissibility of the evidence. Mynatt v. Hudson, 66 Texas, 66, 17 S. W. Rep., 396; Brown v. Perez, 89 Texas, 282, 34 S. W. Rep., 725; Rice v. Ward, 93 Texas, 532, 56 S. W. Rep., 747."

As indicative of the impossibility of fixing an arbitrary rule we cite Thomas v. State, 28 S. W. Rep., 534, where Judge Hurt held it allowable to prove the reputation in Alabama of one who had moved to Texas four years before the trial. In Jones v. State, 104 Ala., 30, the evidence reached back seven or eight years. State v. Espenozei, 20 Nevada, 209,—15 years; Graham v. Crystal, 2 Abb-Dec. (N. Y.), 263,—8 or 10 years, Fry v. State, 96 Tenn., 467,—6 years; Snow v. Grace, 29 Ark., 131,—7 years; Watkins v. State, 82 Georgia, 231,—8 years; Holmes v. Stateler, 17 Ill., 453,—10 years; said ten years beginning at a period 8 years before the trial, and extending 10 years further back. The court held that if it be claimed that the witness had reformed that that fact would be as easy of proof for the opposite party. Morris v. Palmer, 15 Pa. State, 51,—10 years, Brown v. Perez, 34 S. W. Rep., *supra*, permitted a witness to testify to a period covering thirty years, where it was shown that the party testified about was in and out of the State.

Appellant's own testimony brings the evidence in the instant case well within the scope of the cases cited. He says, "I was constantly on the drift," and names Dallas, Seageville, Mineral Wells, Brenham, Bastrop, Terrell, Ballinger and Paint Rock as places where he had lived since leaving Athens, where the reputation was principally made, and also says he had lived at a number of other places, and in one place says he cannot recollect all the places where he had lived. Any presumption that the wife may have reformed after the period covered by such testimony as to reputation, is refuted by the evidence shown in this record. A short time before the homicide appellant himself told the county attorney of Tom Green County that his wife had been down at Ballinger with a coffee drummer, "and stayed a night or two." He also telephoned the county attorney about a week before the killing that she was up in a rooming house at night with a man. He showed the justice of the peace letters which she had gotten from a man by the name of Williams, which were of such a nature as to cause said justice to tell appellant that if she was that kind of a woman he did not see why appellant did not let her get a divorce and go her way. Appellant told the witness Green that he had a talk with deceased about his wife, and "told him what kind of a woman she was." We think the trial court did not err in admitting the evidence.

Referring to appellant's contention here that the trial court erred in admitting evidence of specific instances of the wife's immorality, it is sufficient to say that no objection was urged to any evidence upon this ground. From what we have said it also follows that there was no error in the court's refusal to give the special instruction not to consider the testimony as to the reputation of the wife.

Appellant's special charge No. 3 was covered by the court's instruction on that point in the main charge. Special charge No. 5 was on the weight of the evidence and omitted several legal propositions necessary to reduce homicide to manslaughter. The court's charge on manslaughter is not open to the criticisms directed at it in bill of exceptions No. 26.

It is contended by appellant before this court that under the facts he could have been guilty of no higher grade of homicide than manslaughter. The record discloses that no one was immediately present at the killing but deceased, appellant and appellant's wife. Appellant claimed that his wife was desirous at the time of making up with him and returning to him but that she feared deceased. The wife was not a witness for appellant and could not be for the State. Appellant says he met his wife and deceased at the time of the killing walking along on the street, the deceased on the right hand side of his wife, and that he shot him because he feared attack. The State's theory was that appellant waylaid deceased and shot him from behind a large billboard which stood to one side of the walk. The undertaker who undressed deceased and cared for his body, said that deceased was shot in the side. When found his body lay about ten feet from the billboard near the sidewalk. That our views on the question of manslaughter as applied to this case be fully understood, we give them at length.

What are the facts? Appellant shot and killed one Stokes on a public street in the City of San Angelo, Texas, on the night of December 6, 1916. Appellant and his wife had separated sometime before this. He says he quit her at Paint Rock, Concho County, and that she filed suit for divorce there in August, 1916. The record shows that they had separated several times before. After this separation in August, the wife came to San Angelo and stayed at a hotel with her daughter, and sometime in October of that year deceased began to pay her attention, and, according to the evidence, would take her out to picture shows several times a week. There is no evidence in the record of any illicit relations between the deceased and the wife of appellant. There were no witnesses introduced in behalf of the appellant except himself, and he swore that he shot the deceased in self-defense; that on Saturday before the homicide on Wednesday, he told deceased that he had to forever leave his wife alone and not bother her any more, and that deceased on said occasion drew a pistol and held it on the appellant and told him, "She may have been your wife at one time, but she is going to be mine;" that he stood quietly and listened to the deceased and replied, "Well, Stokes, I guess then I will have to get out of town," and that deceased told him to leave town; that he left the next morning on the train and sent back a letter to his wife in a few

days which letter was introduced in evidence and stated in sub-
stance that he had withdrawn any opposition to her getting a di-
vorce and that she could get the divorce and do as she pleased.
Appellant further stated, when on the witness stand, that he came
back to San Angelo on the afternoon of December 6th and found
that his wife was still in town and that he talked with one Grayson,
a saloon keeper, who told him that deceased and Mrs. Bibb were
going to marry and that deceased would kill him if he didn't get
out of town." He also says that he replied to Grayson, "Well, I
guess not;" that he went around San Angelo that afternoon look-
ing for work and made arrangements with a contractor named
Chance to go to work for him; that later still he went over to
Grayson's saloon and had a talk with him and Grayson asked him
"Had I seen them;" he said no, and Grayson told him he had
better leave town or "that fellow will kill you tonight;" that he
replied to Grayson: "If there is any killing, I will be at it," and
he then went across the street and rented a double-barrelled shot-
gun, that he got the gun to protect himself; that he then went to
a room which he had rented and found he had forgotten his tools;
he started back after them and on the way met deceased and Mrs.
Bibb walking on the street; that when he met them, deceased
grabbed Mrs. Bibb and said "There he is now, I will get him;"
that they were about eighteen or twenty feet apart and when
Stokes said that, appellant said he shot him; that deceased had
something in his hand but he did know what it was but thought
it was another pistol. Appellant also swore: "I thought he was
going to shoot me or I would not have shot him." He further
said: "I did not hide behind that bill-board and wait for him to
come along." He further said in his direct testimony that the
first time he saw his wife was when she and the deceased left the
Three Sisters Hotel; a little later in his testimony, however, he said
the first time he had seen them was when the shooting occurred
and repeated the statement that he shot Stokes to keep Stokes from
shooting him.

The charge of the court fully and fairly submitted the law of
self-defense and is not open to the criticisms of appellant. The
evidence objected to, as shown by appellant's bill of exceptions,
appears to us to be admissible in each instance. There is but one
question in the case which has given this court any serious trouble,
and that is, was the issue of manslaughter in the case, and if so,
did the trial court correctly submit the law on that issue?

The record is one which almost stagers credulity in its reve-
lation of human depravity. Without contradiction even from
appellant it shows that the reputation of the wife of appellant had
been bad for chastity for many years, and that appellant himself

had been a solicitor for patronage of her shame, collecting money himself therefor from those whom he induced to share her carnal favors; moving from place to place frequently, or as he put it, "constantly on the drift." She would quit him here and he would quit her there. Some months before this homicide he says he quit her in Paint Rock and she sued him there for divorce. This was in August, 1916. He left Paint Rock and went to Brady, Brownwood, Shreveport, Ft. Worth and other places. She went to San Angelo where her daughter was working in the telephone office. In October appellant appears to have "drifted" to San Angelo, and from the stories told by the many witnesses to whom he talked, his wife would not see him or talk to him or have anything to do with him. He does not seem to have hesitated to spread the story of her character or life among these witnesses. The county attorney testified that appellant told him that his wife had gone down to Ballinger with a coffee drummer and spent several nights. The same witness also, the county attorney, said that appellant called him up one night and told him that appellant's wife was in a rooming house with some man. The justice of the peace says that appellant almost forced him to read two letters between appellant's wife and a man by the name of Williams; that after reading them that he told appellant that if his wife was the kind of woman those letters would indicate he didn't see why appellant didn't let her get her divorce and go on about her business. Green testified that appellant told him that in a conversation with deceased on Saturday before the killing he told the deceased what kind of woman his wife was. Green further swears that he saw appellant at the Orient train on Sunday before the killing and shook hands with him and appellant told him he was going to "take you all's advice and leave here;" that he thought he had broken up Stokes' playhouse. It is thus made clear that not only was appellant perfectly aware of his wife's profligacy but that he regarded discussion of that fact as public property, and he is not shown to have exhibited any anger, rage, resentment, or other emotion when discussing other men's use of her body for their own pleasure. That he had no animosity against deceased for any such reason is apparent from the fact that deputy sheriff Green saw the two men talking at the courthouse on Saturday and appellant says they had no hard words but had a pleasant talk, this being the conversation in which he told deceased what kind of woman his wife was.

These facts are stated, having in mind that this court held in Redman's case, 52 Texas Crim. Rep., 591 that the accusation of unchastity made against a female relative could not be adequate cause to arouse the mind of a male relative who already knew the

fact of such unchastity; and of the further holding of this court in Teague's case, 67 Texas Crim. Rep., 41, 148 S. W. Rep., 1063, that one who spoke of his wife and sister as whores was not in position to claim an overpowering passion against another who said that he had seen the sister of the man in a compromising situation. In other words, if appellant knew that his wife was in the habit of indiscriminate bestowal of carnal favors upon men and cared so little for such fact that he could coolly publish the same and discuss it with strangers, then this court will consider such fact in determining if manslaughter be in this case.

It is held, in many cases decided by this court, that four things must appear in a given case in order to reduce the same to manslaughter. 1. The occurrence of insulting conduct or words; 2, proof that this was the real cause of the killing; 3, proof that, if this was its real cause, the killing must have taken place immediately on the happening of the insult or soon thereafter as the accused met the insulter, after learning of the insult; 4, proof that if the killing was caused by such words or conduct that the mind of the accused was affected to such an extent as would commonly render the mind of a person of ordinary temper, incapable of cool reflection. Eanes v. State, 10 Texas Crim. App., 421; Niland v. State, 19 Texas Crim. App., 166; Ormon v. State, 22 Texas Crim. App., 604; Howard v. State, 23 Texas Crim. App., 265; Jones v. State, 33 Texas Crim. Rep., 492; Knowles v. State, 31 Texas Crim. Rep., 383; Reagan v. State, 70 Texas Crim. Rep., 498.

It seems not reasonable that a man may be shown to have knowledge of his wife's criminal intimacy with any number of men without any passion being aroused, and that he should still be allowed to set up such intimacy with one other man, as having produced uncontrollable passion. If however our merciful construction of this statute should be that a man may make merchandise out of his wife's body and still have the right to use such fact as a cause of excusing passion in some case in which he had not given his consent to such relation, and if we hold in the instant case that the wife of appellant being with the deceased on a public street of San Angelo, was insulting conduct to appellant, there would still have to be in this case some evidence from some source, of the other three necessary elements of manslaughter.

If deceased, being with appellant's wife, was insulting conduct, under the statutes and decisions, it must have created in his mind that reasonable surge of passion conceded by human frailty to the ordinary man in a case of insulting words or conduct which would hurl him at the throat of the insulter when he first sees him or sees them together. What are the facts in this case? Appellant told Grayson on the same night, and just a little before

the killing, that if deceased went with his wife he was going to kill him. Appellant was shown to be watching the place where his wife was from behind fences, out of doorways, from behind billboards and in alleys until he sees her come out of the hotel with deceased, as he swears himself; and then instead of yielding to the supposed irresistible passion at this first meeting, he coolly goes down to the saloon of Grayson and has a talk with him in which he claims that he was told by Grayson repeatedly that deceased was going to kill him that night; that from Grayson's place he went to a pawn shop and rented a double-barrelled shotgun as he says to defend himself with, and then goes to his room and from his room starts after his tools and accidentally meets his wife accompanied by deceased walking along, deceased having a paper sack of grapes in his hand, and appellant says he shot him to prevent deceased from shooting him with what he had in his hand. There is no pretense that he killed, at the first meeting of deceased with his wife that night. There can be no manslaughter in such case under these facts, and this must have been known to appellant, hence the need of his ascribing to his act some other motive when on trial before a jury.

Appellant did not claim on the witness stand that he was angry or excited when he saw his wife with deceased nor when he shot; neither did any of the other numerous witnesses who saw him on that fatal night, both before and after the shooting, say that he betrayed any excitement; on the contrary they say he was not excited but acted as he usually did. It is impossible to inspect this record without being soundly convinced that if it be conceded that a wife of the kind and character that appellant had told so many people his was, could, by her going with another man, make the conduct of such other man insulting to her husband, still the other three elements of manslaughter were wholly absent from the case, even under the evidence of appellant himself.

The trial court, out of abundant caution, charged on manslaughter, using the language of the statute substantially. The jury were told in the charge, that insulting words or conduct of the person killed toward a female relative of the accused, would be an adequate cause for the passion which would reduce the killing to manslaughter; and not only this, but the court went further in said charge and told the jury that "any condition or circumstance which is capable of creating, and does create sudden passion such as anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection, whether accompanied by bodily pain or not, is deemed adequate cause;" and the court charged as follows; in applying the law to the facts:

"Now, if you believe from the evidence, beyond a reasonable doubt, that the defendant, with a deadly weapon, in a sudden pas-

sion arising from an adequate cause, as the cause has been herein-before explained, and not in defense of himself against an unlaw-ful attack producing a reasonable expectation or fear of death or serious bodily injury, with intent to kill, did, in the County of Tom Green and State of Texas, on or about the 6th day of December, 1916, as alleged, shoot, with a gun, and thereby kill said Ed. Stokes, as charged in the indictment, you will find the defendant guilty of manslaughter and assess his punishment at imprison-ment in the State penitentiary for a term of not less than two years nor more than five years.

"And in this connection, you are further instructed: That if the defendant reasonably believed that the deceased had been prior to or at the time of the homicide guilty of insulting conduct to-wards defendant's wife, and that such belief produced in the mind of defendant such a degree of anger, rage, resentment or terror as to render it incapable of cool reflection, and if defendant upon forming the belief of such insulting conduct, if any, immediately, or upon his first meeting with the deceased after he had formed the belief of such insulting conduct, if he did form same, and while under the influence of such passion, rendering his mind in-capable of cool reflection caused by such belief (if he in fact so believed) did shoot the deceased with a gun with the intention of killing him and that the shot or shots, if any, so fired by him struck and thereby killed the deceased, then and in such event in case you find the defendant guilty, it should be of no higher grade of offense than manslaughter."

It will thus be seen that the court did not limit the jury to insulting conduct *ipso nomine* but allowed them to range through the entire evidence to find "any condition or circumstance which is capable of creating, and does create sudden passion," and tells them that if from any such cause, sudden passion arose and caused the killing it would be manslaughter, and then further specifically called their attention to insulting conduct as adequate cause. This charge, under the circumstances of this case, was favorable to the appellant. Appellant has had two trials of this charge, each re-sulting in a conviction of murder, and his punishment was fixed at life imprisonment in the instant case. The jury evidently be-lieved, as they have the right to do in a given case, that those things that the human heart holds highest—the virtue of woman, protection of the marriage altar, the sacred love of wife, were but light things in the estimation of this appellant and they were not brought into this case by him because they had been besmirched by the deceased, but in order to attempt to escape the legal con-sequences of his act. We believe appellant has had a fair trial and the law was fairly submitted to the jury. The jury have passed on this case and in the exercise of their function have fixed his punish-

ment. We believe there are no reversible errors in the record and the judgment of the lower court is affirmed.

*Affirmed.*

MORROW, Judge.—The introduction in evidence by the appellant of his *res gestae* statement made immediately after he killed the deceased, to the effect in substance that the trouble was because the deceased had broken up the family of appellant was sufficient indication to the State that appellant would rely, in mitigation of the homicide, upon the statute reducing the offense to manslaughter when it happens on the first meeting after the use of insulting words to a family relation. See Penal Code, article 1132, subd., 4 and article 1133. The matter having been thus opened by the appellant, the State, under article 1134, was privileged to prove the general character of appellant's wife for the purpose, as stated in the statute, of ascertaining the extent of the provocation; and on the same theory the evidence introduced showing appellant's knowledge of his wife's conduct on specific occasions was rendered competent. We do not think the proof of the unchaste character of appellant's wife took the issue of manslaughter out of the case. It was held in Nelson v. State, 206 S. W. Rep., 361, that the jealousy of the appellant aroused by the conduct of a woman who was not his wife toward another was sufficient, in connection with other circumstances developed, to require the submission of the issue of manslaughter. The manner in which it was submitted to the jury is not, in the judgment of the writer, subject to any of the criticisms addressed to it, and the special charge which was requested on the subject, we think, was properly refused. I believe that the judgment should be affirmed.

DAVIDSON, Presiding Judge.—I cannot agree to this affirmance under the record as made by the facts and exceptions as to evidence and charges given, and refused, and may write later.

ON REHEARING.

October 29, 1919.

LATTIMORE, Judge.—This case is before us upon appellant's motion for rehearing, and in view of the fact that most of the contentions therein revolve substantially around certain points, we shall state the grounds thereof rather fully.

Appellant's bill of exception No. 15 sets forth that after having testified that the reputation for chastity of appellant's wife was bad at Athens, Texas, ten years prior to the time of the trial, a witness was asked, and stated over objection, that about said time ap-

pellant solicited him to go to his house for illicit intimacy with a woman, and that when he got to the house, he was directed by appellant to go to a certain room, within which he would find the party; and that within said room he found appellant's wife.

Bill of exception No. 17 sets forth that after having testified that the reputation of appellant's wife for chastity was bad at Mineral Wells,, and Athens, Texas, some thirteen years prior to the time of the trial, a witness was asked, and over objection stated that at Mineral Wells appellant solicited him to go to his house and engage in sexual intercourse with his wife that night, which he, the witness, did, and the next morning appellant came to the witness's place of business and told him that he forgot to pay his bill the night before, and that same was two dollars; that witness gave appellant $1 and promised him the remainder.

Bill of exception No. 18 sets forth that after having testified that the reputation for chastity of appellant's wife was bad at Mineral Wells and Athens, more than thirteen years prior to the time of the trial, a witness was permitted, over objection, to testify that at about said time he overheard a conversation between appellant and another man, in which the other party charged that appellant invited him to his house to have sexual intercourse with his wife, and that she had given him a bad disease, which appellant denied by the statement that "She couldn't have given it to you; she never had a bad disease in her life." That the other party insisted that she had.

In addition to urging that we have failed to pass on these bills in the original opinion, it is contended in this motion that the trial court's charge on manslaughter restricted same to those emotions of the mind arising from insulting conduct, and that there was no conduct of deceased in evidence which could come within the meaning of that term; and that the special charge on manslaughter asked by appellant should have been given.

Relative to these contentions, we observed that manslaughter, in appellant's opinion, was in the case, which fact is evidenced by his special charge on that proposition. As stated in the original opinion, the issue of manslaughter was raised by the testimony, in our opinion.

We further observed that the fact that appellant's wife was the cause of the killing is apparent, and that the degree of homicide, if unlawful, was to be determined by the attitude of appellant towards the deceased at the time, said attitude to be arrived at by the jury in the light of all the facts and circumstances in evidence.

Where it is claimed that the deceased broke up the family of the accused, and that the killing resulted therefrom, the husband has the right to have submitted to the jury the question as to whether the attentions of the deceased to his wife were sufficient to cause in his mind those emotions which reduce to manslaughter; but

in such case, if it be suggested by the testimony that the wife is a prostitute and that the husband knew that fact, and that her prostitution ordinarily raises in his mind no anger, rage, or resentment, we would hold these very material matters, in order to enable the jury to determine in the instant case his real attitude, under all the facts and circumstances, toward the party slain, and to enable the jury to decide whether the killing resulted from malice or uncontrollable emotion. We do no violence to the evidence to say that appellant's own discussion and statements about his wife, in the instant case, appear to sufficiently establish the fact that she was in the unfortunate class named. Such being the case, it was pertinent and material to show the facts from which appellant's knowledge, consent to, and willingness for her to indulge in such conduct, would be inferred. The fact that such evidence covered a period of years, might affect its weight, but in the absence of evidence of some reform or change of habits or character, during such lapse of time, on the part of the wife, would not affect its admissibility. There seems to be no evidence in this record to indicate any change in the character of the wife prior to the time of this homicide, and it is abundantly established that a short time before said killing and without any apparent anger, rage, or resentment, the appellant discussed with various and sundry witnesses his wife's different recent lapses in this direction. This was fully discussed in the original opinion.

We further observe that all this evidence was admitted, and bears directly on the motive and mental condition of the accused, and is, therefore, not subject to the objection that it is an attack upon the reputation or character of the appellant. Proof of another crime, or of various facts becomes admissible and material as affecting motive in many cases, and is not subject to the criticism, or open to the objection, that it is inadmissible because it is an attack upon the reputation or character of the defendant.

If insulting conduct to a female relative be not the ground relied on to reduce this case to manslaughter, we are unable to perceive any other. It was without dispute that appellant and his wife were separated and that she had sued him for divorce and refused to make up with him; that deceased was keeping company with her, and, according to appellant's own testimony, told him in an interview between them a few days prior to the killing, that he intended to marry her. Appellant stated to the witness Green that on said occasion he told deceased of the character of his wife as a lewd woman, and endeavored to "break up Stokes' play house." It is evident, however, that after that deceased continued to keep company with the woman openly, and it was not claimed on behalf of appellant that his discovery of the fact that deceased was going with her was sudden, nor that said attentions were clandes-

tine. We quoted from the court's charge on manslaughter in the original opinion, showing both a general and special application of the law of manslaughter to the facts of the case, and this appears to be sufficient.

The requested charge on manslaughter was as follows: "Special charge No. 5 requested by Defendant.

Gentlemen of the jury: You are instructed that if the defendant believed that the deceased had been guilty of keeping company with defendant's wife and that the deceased was instrumental in preventing the defendant's wife from returning to defendant and living with him, and that at the time of the homicide the defendant met the deceased and his, defendant's wife, in company with each other on the sidewalk at night, and if you believe that all of these facts taken together produced in the mind of the defendant such a degree of anger, rage, resentment or terror as to render it incapable of cool reflection and if defendant did while under the influence of such passion rendering his mind incapable of cool reflection kill the deceased, then in such event you cannot find the defendant guilty of a higher degree of homicide than manslaughter or if you have a reasonable doubt as to whether or not such facts did produce in the mind of defendant such a degree of anger, rage, resentment or terror as to render it incapable of cool reflection, then you will give the defendant the benefit of such doubt and find him guilty of no higher offense than manslaughter. You will give this charge equal *weight with the main charge.*"

This charge is on the weight of the evidence, ignores the statutory requisite that the matters grouped therein must be adequate cause, and misapplies he doctrine of reasonable doubt. The three facts grouped in said charge could not reduce the killing to manslaughter unless, under the circumstances, they would have had that effect on a person of ordinary temper, situated as appellant was. So the existence in the minds of the jury of a reasonable doubt as to whether these facts produced in appellant's mind uncontrollable emotions, would certainly not have justified them in finding him guilty only of manslaughter.

We have carefully examined each contention of appellant, and investigated all of the authorities cited, but are unable to perceive any error in the original opinion; and the motion for rehearing is accordingly overruled.

*Overruled.*